*281
 
 Markey, J.
 

 In this action for medical malpractice, defendants appeal by right the amended judgment entered on the jury verdict for plaintiff in the amount of $15 million and from the trial court’s postjudgment order denying defendants’ motions for judgment notwithstanding the verdict (jnov), a new trial, and remittitur. Plaintiff cross appeals by right the trial court’s determination of the amount of damages awarded by the jury in its verdict for plaintiff. The appeals were consolidated. We vacate the judgment in favor of plaintiff and remand for entry of JNOV for defendants because there is legally insufficient evidence to support the verdict for plaintiff. We further hold that even if defendants were not entitled to entry of a judgment on their behalf, defendants would be entitled to a new trial because the misconduct of plaintiff’s lead counsel at trial denied defendants a fair trial.
 

 i
 

 It was plaintiff’s theory at trial that defendant Dr. David Forst, a cardiologist, negligently failed to diagnose and appropriately treat plaintiff for cardiogenic shock,
 
 [1]
 
 particularly that he failed to appropriately treat plaintiff’s low blood pressure between 4:00 P.M. and 6:00 P.M. following plaintiff’s admission to defendant William Beaumont Hospital-Troy for a heart attack on March 16, 1993. Plaintiff contended that as a result of Dr. Forst’s negligent treatment of plaintiff
 
 *282
 
 for cardiogenic shock, gangrene developed in plaintiffs extremities from loss of circulation to and oxygenation of the tissues in these areas, which ultimately resulted in amputation of plaintiffs fingers, thumbs, and both legs at the knee.
 

 Defendants maintained below that plaintiff did not suffer from cardiogenic shock and that the conditions that ultimately required the amputation of his extremities resulted from an unexpected, rare, and severe sensitivity reaction to the streptokinase
 
 [2]
 
 that plaintiff received in the hospital’s emergency center. It was defendants’ position that once the reaction to streptokinase had set in, they were virtually powerless to stop the ensuing, cascading events.
 

 n
 

 JUDGMENT NOTWITHSTANDING THE VERDICT
 

 Defendants claim that the trial court erred in issuing its ruling on their motion for JNOV without making any findings regarding the legal sufficiency of the evidence supporting plaintiffs claim, specifically the testimony of plaintiff’s only expert, Dr. Daniel Wohlgelemter, that plaintiff suffered from cardiogenic shock. Defendants further claim that the trial court erred in denying their motion for JNOV because the evidence was legally insufficient to support plaintiff’s claim for medical malpractice. We agree with both of defendants’ claims.
 

 
 *283
 
 A
 

 At the hearing on defendants’ postjudgment motions, the court made prefatory remarks regarding defendants’ motion for a new trial based on misconduct by plaintiff’s lead counsel and then ruled as follows on defendants’ motion for JNOV:
 

 But I’m not ruling on [defendants’ claims of denial of a fair trial on account of plaintiff’s counsel’s misconduct during trial]. I’m ruling on what happened here with the jury, and the jury — another jury certainly may not have come back the same way. If it had been tried before the bench, it may not have come back the same way. But it went to the jury, and based upon what the jury did, I can merely indicate to the defendants in this matter that their next step is — and I think I said this a few motions ago — that this Court is through with the matter. It’s headed — if you’re going to go to somewhere else, and I hate to try to be humorous or anything — but it’s 67 miles from here. It’s not this Court. This Court has done all it can do, based upon — some of these points may be fine. It’s been well-briefed. But I’m not going to grant any relief to the defendants in this matter, and I so rule.
 

 Pursuant to MCR 2.610(B)(3), in ruling on a motion for JNOV, “the court must give a concise statement of the reasons for the ruling, either in a signed order or opinion filed in the action, or on the record.” Although MCR 2.610(B)(3) does not require formal findings of fact and conclusions of law as in a bench trial under MCR 2.517, in ruling on defendants’ motion for jnov the court was required to examine the evidence presented at trial in the light most favorable to plaintiff, apply the law to the facts, and state whether the evidence presented at trial was legally sufficient to support plaintiff’s claim of medical malpractice.
 
 Forge v Smith,
 
 458 Mich 198, 204;
 
 *284
 
 580 NW2d 876 (1998);
 
 Pontiac School Dist v Miller, Canfield, Paddock & Stone,
 
 221 Mich App 602, 612; 563 NW2d 693 (1997). Here, the court inappropriately directed its consideration solely to the jury’s ultimate finding with regard to the evidence, rather than to the sufficiency of the evidence in support of plaintiff’s claim. See
 
 In re Cotcher’s Estate,
 
 274 Mich 154, 162; 264 NW 325 (1936).
 

 Despite the trial court’s apparent failure to engage in an appropriate review of the evidence in deciding defendants’ motion and to issue a ruling accordingly, our review of this issue is not impeded. We conduct review de novo of the evidence presented at trial to determine if the trial court clearly erred in denying defendants’ motion for jnov.
 
 Forge, supra
 
 at 204. Our resolution of this issue turns on application of the facts to the law and on the evidence adduced, and we view all legitimate inferences from the evidence in the light most favorable to plaintiff.
 
 Id.
 
 Only if the evidence so viewed fails to establish a claim as a matter of law is jnov appropriate.
 
 Id.
 

 B
 

 A plaintiff’s theory in a medical malpractice case must be pleaded with specificity and the proofs must be limited in accordance with the theories pleaded. MCR 2.111(B)(1);
 
 Weymers v Khera,
 
 454 Mich 639, 654-655; 563 NW2d 647 (1997);
 
 Dacon v Transue,
 
 441 Mich 315; 490 NW2d 369 (1992);
 
 Simonelli v Cassidy,
 
 336 Mich 635; 59 NW2d 28 (1953). It is important to highlight the fact that in this case the court’s pretrial order limited plaintiff’s claim to the allegation that Dr. Forst’s negligent failure to diagnose and treat plaintiff for cardiogenic shock caused plaintiff’s inju
 
 *285
 
 ries. Plaintiff specifically notes on appeal that Dr. Wohlgelemter presented his liability theory and that plaintiff did not claim any breach of a standard of care other than what had been pleaded. To establish that Dr. Forst was negligent in diagnosing or treating plaintiff for cardiogenic shock, it was encumbent on plaintiff to first prove that plaintiff in fact suffered from cardiogenic shock on March 16, 1993, during Dr. Forst’s care of plaintiff. Dr. Wohlgelemter was the sole expert witness plaintiff offered to establish that fact. No other expert witness at trial testified that plaintiff was in cardiogenic shock on March 16, 1993.
 

 In
 
 Skinner v Square D Co,
 
 445 Mich 153, 162-170; 516 NW2d 475 (1994), a products liability case, our Supreme Court clarified what is required to establish cause in fact. Referencing Prosser & Keeton, Torts (5th ed), § 41, p 266, the Court stated that “[t]he cause in fact element generally requires showing that ‘but for’ the defendant’s actions, the plaintiff’s injury would not have occurred.”
 
 Skinner, supra
 
 at 163. Our Supreme Court explained that “[t]o be adequate, a plaintiff’s circumstantial proof must facilitate reasonable inferences of causation, not mere speculation,”
 
 id.
 
 and 164, and reaffirmed that “the plaintiff must present
 
 substantial evidence
 
 from which a jury may conclude that more likely than not, but for the defendant’s conduct, the plaintiff’s injuries would not have occurred.”
 
 Id.
 
 at 164-165 (emphasis added). Our Supreme Court noted that it has consistently applied this threshold evidentiary standard of factual causation in negligence cases:
 

 “The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in
 
 *286
 
 fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.”
 
 [Id.
 
 at 165; citations omitted.]
 

 Accord
 
 Weymers, supra
 
 at 647-648 (a medical malpractice case). The Supreme Court in
 
 Skinner
 
 also concurred with the observation made in 57A Am Jur 2d, Negligence, § 461, p 442, that negligence is not established if the evidence lends equal support to inconsistent conclusions or is equally consistent with contradictory hypotheses.
 
 Skinner, supra
 
 at 166.
 

 This Court has held that an expert’s opinion is objectionable where it is based on assumptions that are not in accord with the established facts.
 
 Green v Jerome-Duncan Ford, Inc,
 
 195 Mich App 493, 499; 491 NW2d 243 (1992);
 
 Thornhill v Detroit,
 
 142 Mich App 656, 658; 369 NW2d 871 (1985). This is true where an expert witness’ testimony is inconsistent with the testimony of a witness who personally observed an event in question, and the expert is unable to reconcile his inconsistent testimony other than by disparaging the witness’ power of observation.
 
 Green, supra
 
 at 500.
 

 c
 

 Dr. Wohlgelemter testified that there are three definitive hemodynamic measurements that are required for a diagnosis of cardiogenic shock: (1) a wedge pressure of greater than 18, (2) a cardiac index of less than 1.8, and (3) a systolic blood pressure of less than or equal to 80. Dr. Wohlgelemter agreed that hemodynamic measurements are technical devices to measure whether a condition, such as cardiogenic
 
 *287
 
 shock, is present. The hemodynamic measurements in this case did not support a finding that plaintiff was in cardiogenic shock on March 16, 1993. Plaintiff’s wedge pressure and cardiac index were within normal range.
 

 More importantly, the experts, including Dr. Wohlgelemter, agreed during the trial that the major component of cardiogenic shock consists of
 
 significant
 
 damage to the heart’s pumping action. In the face of hemodynamic measurements that were contrary to a diagnosis of cardiogenic shock, Dr. Wohlgelemter explained that he based his opinion that plaintiff was in cardiogenic shock on his “skepticism” of the echo-cardiogram performed by Dr. John Cieszkowski on March 16 and his unwillingness to accept Dr. Cieszkowski’s finding that the wall function of plaintiff’s heart, specifically the left ventricular function that pumps the blood out of the heart, was nearly normal.
 
 [3]
 

 Regarding the echocardiogram in question, Dr. Cieszkowski testified that he did not merely review a videotaped recording of the echocardiogram of plaintiff’s heart, but instead observed the echocardiogram while it was in progress whereby he could actually view the pumping function of plaintiff’s heart. He testified, and the evidence supported, that he had sufficient time to study the echocardiogram while it was being conducted. Dr. Cieszkowski reported that the echocardiogram showed that plaintiff’s left ventricular function was “essentially normal and preserved”
 
 *288
 
 and that it had “surprisingly normal function,” which would rule out a diagnosis of cardiogenic shock.
 

 The reports of two different doctors who performed plaintiff’s echocardiograms on March 17 and March 19 confirmed Dr. Cieszkowski’s essential findings. Although Dr. Wohlgelemter believed that the later echocardiograms showed some heart wall motion abnormalities, he agreed that the echocardiogram performed on March 19 did not demonstrate definite evidence of major damage to plaintiff’s heart wall. Dr. Wohlgelemter further agreed that the echo-cardiograms showed that the “ejection fraction,” i.e., the amount of blood pumped out of plaintiff’s heart, was within normal range and showed that plaintiff’s left ventricular systolic function was fairly well-preserved.
 

 Indeed, Dr. Wohlgelemter acknowledged that if, contrary to his skepticism, the March 16 echocardiogram study had in fact shown relatively normal heart wall motion, he would be “very happy to agree” that “this was not cardiogenic shock in any shape, way, or form” and that if the basis of his opinion were wrong, then his opinions were flawed and incorrect. Here, the record clearly reflects that Dr. Wohlgelemter had no reasonable basis in evidence to support his opinion that plaintiff’s left ventricular heart wall function was significantly damaged on March 16, which he agreed was the pertinent time frame and the definitive component for a diagnosis of cardiogenic shock. Rather, as he explained, he based his opinion on his skepticism and disparagement of Dr. Cieszkowski’s findings. This testimony was legally insufficient to support Dr. Wohlgelemter’s expert opinion, through which plaintiff’s liability theory was presented, that
 
 *289
 
 plaintiff was in cardiogenic shock on March 16.
 
 Skinner, supra; Green, supra; Thornhill, supra.
 
 Notably, Dr. Wohlgelemter specifically acknowledged that on the basis of the information in the record, a competent cardiologist might logically conclude that plaintiff did not have cardiogenic shock, and he agreed that a reaction to streptokinase could not be ruled out in this case.
 

 After thoroughly reviewing the entire record of this trial, and doing so in a light most favorable to plaintiff, we are compelled to conclude that plaintiff failed to present substantial, legally sufficient evidence to establish that he suffered from cardiogenic shock, the sole claim on which defendants’ negligence was predicated. Defendants were entitled to entry of JNOV. See
 
 Skinner, supra
 
 at 173, n 17. We vacate the judgment in favor of plaintiff and remand to the trial court for entry of JNOV on behalf of defendants.
 

 m
 

 MISCONDUCT OF COUNSEL
 

 Because our resolution of the foregoing issue is dis-positive of this case, we need not consider the parties’ remaining issues on appeal except defendants’ claim that they were denied a fair trial because of the persistently improper and highly prejudicial conduct of plaintiff’s lead counsel at trial. We must agree that the conduct of plaintiff’s lead counsel was truly egregious—far exceeding permissible bounds—and we will therefore address this issue. We hold that even if defendants were not entitled to JNOV, defendants would be entitled to a new trial because of pervasive
 
 *290
 
 misconduct by plaintiffs lead trial counsel that denied defendants a fair trial.
 

 In reaching this decision, we are guided by the following:
 

 When reviewing an appeal asserting improper conduct of an attorney, the appellate court should first determine whether or not the claimed error was in fact error and, if so, whether it was harmless. If the claimed error was not harmless, the court must then ask if the error was properly preserved by objection and request for instruction or motion for mistrial. If the error is so preserved, then there is a right to appellate review; if not, the court must still make one further inquiry.
 
 It must decide whether a new trial should nevertheless be ordered because what occurred may have caused the result or played too large a part and may have denied a party a fair trial. If the court cannot say that the result was not affected, then a new trial may be granted.
 
 Tainted verdicts need not be allowed to stand simply because a lawyer or judge or both failed to protect the interests of the prejudiced party by timely action.
 
 [Reetz v Kinsman Marine Transit Co,
 
 416 Mich 97, 102-103; 330 NW2d 638 (1982) (emphasis added).]
 

 Throughout the entire trial, plaintiff’s lead trial counsel completely tainted the proceedings by his misconduct.
 
 [4]
 
 For example, through innuendo and direct attack, plaintiff’s lead trial counsel repeatedly and with no basis in fact accused defendants and their witnesses of engaging in conspiracy, collusion, and perjury to cover up their alleged malpractice. Plaintiff’s lead trial counsel continually accused defense witnesses of fabricating, in response to the
 
 *291
 
 instant litigation, the defense that plaintiff had a rare, severe reaction to streptokinase that caused his injuries. Indeed, this appeared to be his main theme. Plaintiffs lead trial counsel also repeatedly belittled defense witnesses and suggested, again, with no basis in fact, that they destroyed, altered, or suppressed evidence. Plaintiffs lead trial counsel further insinuated, relentlessly, outrageously, and with no supporting evidence, that while plaintiff lay “neglected” in the coronary care unit of the hospital, Dr. Forst “abandoned” plaintiff to engage in a sexual tiyst with a nurse during the afternoon of March 16. Plaintiffs lead trial counsel repeatedly argued that money and greed were the defendants’ prime motivation and the overriding interest guiding their treatment of plaintiff and their desire to cover up their “mistakes.” Counsel in turn linked these concepts with references to Beaumont Hospital’s corporate power and with defendants’ ability to hire the “dream team” to defend them and to raise as many defenses as they wanted no matter how “preposterous.” Plaintiff’s lead trial counsel also inappropriately appealed to the jurors’ self-interest as taxpayers where, in response to a defense witness’ testimony regarding vocational rehabilitation services available to plaintiff through a state-funded agency, counsel lambasted the defense for suggesting that the “taxpayers” should pay for vocational rehabilitation services for plaintiff rather than the “wrongdoers.” Again, we emphasize that these accusations, allegations, and insinuations had no reasonable basis in the evidence presented and were completely improper.
 

 Moreover, the conduct that occurred in this trial was at least as egregious, if not more so, than conduct of
 
 *292
 
 a similar nature in other cases that required reversal for a new trial.
 
 [5]
 
 See
 
 Reetz, supra; Kern v St Luke’s Hosp Ass’n of Saginaw,
 
 404 Mich 339; 273 NW2d 75 (1978);
 
 Wayne Co Bd of Rd Comm’rs v GLS LeasCo,
 
 394 Mich 126; 229 NW2d 797 (1975);
 
 Shemman v American Steamship Co,
 
 89 Mich App 656, 666-671; 280 NW2d 852 (1979). In short, it appears that plaintiff’s lead trial counsel here did just what the courts in the above cases condemned: he sought to divert the jurors’ attention from the merits of the case and to inflame the passions of the jury. That strategy paid off handsomely here in the form of a large verdict for plaintiff. The cumulative effect of the improper innuendo, remarks, and arguments by plaintiff’s lead trial counsel was so harmful and so highly prejudicial that we are unable to conclude that the verdict in this case was not affected.
 
 [6]
 

 Reetz, supra
 
 at 103.
 

 Pertinent here are the following remarks by our Supreme Court in
 
 GLS LeasCo:
 
 “While a lawyer is expected to advocate his client’s cause vigorously, ‘parties are entitled to a fair trial on the merits of the case, uninfluenced by appeals to passion or prejudice.’ ”
 
 GLS LeasCo, supra
 
 at 131, quoting
 
 Layton v Cregan & Mallory Co, Inc,
 
 269 Mich 574, 583; 257 NW 888 (1934). “ ‘As long as attorneys will resort to such methods, unjustifiable either in law or ethics, courts have no alternative but to set the verdicts aside.’ ”
 
 GLS LeasCo, supra
 
 at 132, quoting
 
 Atherton v Defreeze,
 
 129 Mich 364, 367; 88 NW 886 (1902).
 

 
 *293
 
 Unfortunately, the record makes it abundantly clear that although the trial court recognized the impropriety of the conduct of plaintiff’s lead trial counsel, the court was either unwilling or unable to control counsel’s conduct. Although defendants frequently objected to the conduct of plaintiff’s lead trial counsel, the trial court more often than not failed to rule on the objections, declined them with little or no instructive comment, or admonished plaintiff’s lead trial counsel to no avail. Particularly disturbing to this Court is that in response to defendants’ postjudgment motion for a new trial based on the misconduct of plaintiff’s lead trial counsel, the trial court acknowledged that it “had great problems with the conduct of counsel during the trial” and could not “condone many things that happened during this trial,” but the trial court then declined to even rule on the claim of misconduct. In this case, as was true in
 
 GLS LeasCo, supra
 
 at 138, quoting
 
 Hillman v Detroit United Railway,
 
 137 Mich 184, 187; 100 NW 399 (1904):
 

 “One cannot read the record without being impressed with the idea that the trial judge got tired of trying to keep counsel within the rules, and that counsel was not willing to acquiesce in the admonitions and suggestions of the court. The mischief done by the improper argument of counsel was not cured by the judge.”
 

 The trial court has a duty to assure that the parties before it receive a fair trial.
 
 Reetz, supra
 
 at 103, n 9. The court in this case did not fulfill this duty and left it to this Court to grant defendants the relief to which they are entitled.
 

 Judgment for plaintiff is vacated. This case is remanded for entry of judgment on behalf of defend
 
 *294
 
 ants notwithstanding the verdict. We do not retain jurisdiction.
 

 [1]
 

 According to plaintiff’s expert, cardiogenic shock is shock (critically low blood pressure resulting in inadequate blood supply to meet the metabolic requirements of the body’s organs) resulting from a malfunctioning of the heart, whereby the heart muscle is not capable of adequately pumping enough blood.
 

 [2]
 

 Streptokinase is a “clot buster” administered to dissolve blood clots and increase circulation to the heart.
 

 [3]
 

 An echocardiogram is an ultrasound that visualizes the heart functions.
 

 [4]
 

 As was the case before the Court in
 
 Wayne Co Bd of Rd Comm'rs v GLS LeasCo,
 
 394 Mich 126, 131; 229 NW2d 797 (1975), “ ‘to recite all such instances [of misconduct] would result in a restatement of the entire record of proceedings,’ ” (quoting
 
 LeasCo’s
 
 contention).
 

 [5]
 

 Defendant Beaumont Hospital contends with some justification that “[t]he record below could serve as a textbook hypothetical of the myriad forms of objectionable conduct that are grounds for reversal.”
 

 [6]
 

 The objectionable remarks of plaintiffs lead counsel were so pervasive that the trial court’s instruction to the jury that statements of counsel are not evidence could not have cured the resulting prejudice in this case.