# STATE OF MICHIGAN

# COURT OF APPEALS

COLEEN JIMENEZ,

       Plaintiff,

v

FORD MOTOR CREDIT COMPANY and
SUBURBAN FORD OF STERLING HEIGHTS,
LLC,

       Defendants/Cross-
       Defendants/Appellees,

and

NIKOLAUS HEINRICH,

       Defendant,

and

PAMELA BYRD,

       Defendant/Third-Party
       Plaintiff/Cross-Plaintiff/Appellant,

and

FORD MOTOR COMPANY,

       Third-Party Defendant.

UNPUBLISHED
December 22, 2015

No. 322909
Macomb Circuit Court
LC No. 2012-004397-NO

Before: SERVITTO, P.J., and WILDER and BOONSTRA, JJ.

PER CURIAM.

      Cross-Plaintiff, Pamela Byrd, appeals as of right the trial court's order granting summary disposition in favor of cross-defendants, Ford Motor Credit Company and Suburban Ford of Sterling Heights, LLC. We affirm.

-1-

On August 24, 2011, Nikolaus Heinrich test-drove a 2012 Ford Focus that was being offered for sale by Suburban Ford of Sterling Heights. While engaged in the test drive, Heinrich rear-ended another vehicle in which plaintiff Colleen Jimenez was a passenger, causing her to suffer injuries. Jimenez brought suit against Heinrich, Ford Motor Credit Company ("Ford"), Suburban Ford of Sterling Heights ("Suburban"), and Pamela Byrd ("Byrd"), contending that they were all owners of the Ford Focus in some respect and thus all responsible for her injuries.

Byrd filed a cross-complaint against Ford and Suburban, alleging that she purchased the Ford Focus at issue from Ford Motor Company (which was distributed and delivered through Suburban) on September 12, 2011, executing a sales contract for the purchase with Suburban. The sales contract was thereafter assigned to Ford. According to Byrd, Suburban represented to her that the Ford Focus was new, when in fact, it had been in the August 24, 2011, accident and had suffered body damage exceeding more than 5% of the manufacturer's suggested retail price. Byrd thus alleged that the vehicle was not "new", that Suburban violated MCL 257.233b in failing to disclose the pre-delivery vehicle damage to her, engaged in fraud and/or misrepresentation, violated Michigan's Motor Vehicle Code, breached the warranty of title, breached express and implied warranties, breached the obligation of good faith, and violated the Michigan Consumer Protection Act.[1] Byrd sought to revoke her acceptance of the vehicle, rescission of the sales contract, and refund of the purchase price of the vehicle under the Michigan Lemon Law.

The Jimenez primary lawsuit was resolved, after which Suburban moved for summary disposition concerning Byrd's cross-claim against it under MCR 2.116(C)(10). Ford joined in and concurred with Suburban's motion. The trial court granted Suburban's motion, finding that the Ford Focus met the definition of a "new motor vehicle" under the relevant statute, that the vehicle had not sustained damage that should have been disclosed, and that the remaining claims asserted by Byrd must be dismissed in that they flowed from the two issues disposed of. The trial court thus dismissed Byrd's cross-claims against Suburban and Ford. This appeal followed.

On appeal, Byrd first contends that the trial court erred in finding that the Ford Focus met the statutory definition of "new" under MCL 257.33a. We disagree.

We review a trial court's summary disposition decision de novo. *Todorov v Alexander*, 236 Mich App 464, 467; 600 NW2d 418 (1999). A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. *BC Tile & Marble Co, Inc v Multi Bldg Co, Inc*, 288 Mich App 576, 582-583; 794 NW2d 76 (2010). In reviewing a motion brought under subsection (C)(10), this Court considers the pleadings, admissions, and other evidence properly submitted to the trial court by the parties, making such consideration in the light most favorable to the nonmoving party to determine whether there is any genuine issue regarding any material fact and whether the moving party is entitled to judgment as a matter of law. *Id*.

---

[1] Byrd asserted that Ford was liable pursuant to the common law of assignment and the language of the finance contract.

Additionally, we review de novo issues of statutory interpretation. *Roberts v Mecosta Co Gen Hosp*, 466 Mich 57, 62; 642 NW2d 663 (2002). The fundamental rule of statutory construction is to give effect to the Legislature's intent. "That intent is clear if the statutory language is unambiguous, and the statute must then be enforced as written." *Weakland v Toledo Engg Co, Inc*, 467 Mich 344, 347; 656 NW2d 175 (2003), *as amended on denial of reh* (Apr. 8, 2003). If, on the other hand, reasonable minds could differ regarding the meaning of a statute, judicial construction is warranted. *Universal Underwriters Ins Group v Auto Club Ins Assn*, 256 Mich App 541, 544; 666 NW2d 294 (2003). A court must be careful not read into a statute anything "that is not within the manifest intent of the Legislature as gathered from the act itself." *Id*., quoting *In re S R,* 229 Mich App 310, 314; 581 NW2d 291 (1998).

There is no dispute that the Ford Focus was sold as a "new" vehicle to Byrd and had not been titled until she purchased it. According to Byrd, however, the Ford Focus was a "demonstrator" rather than a "new" vehicle, as it was being used by a potential customer for testing purposes at the time of the pre-sale collision. Pursuant to the Michigan Vehicle Code, MCL 257.248a(1), "A motor vehicle dealer shall not advertise or represent a motor vehicle to be a demonstrator, executive or manufacturer's vehicle, leased vehicle, new motor vehicle, or used or secondhand vehicle unless the vehicle so described is as defined in this act." The Michigan Vehicle Code defines a "new" vehicle as "a motor vehicle which is not and has not been a demonstrator, executive or manufacturer's vehicle, leased vehicle, or a used or secondhand vehicle." MCL 257.33a. A "demonstrator" is "a motor vehicle used by a prospective customer or a motor vehicle dealer or his agent for testing and demonstration purposes." MCL 257.11a.

It is not clear by looking at MCL 257.11a whether "testing and demonstration purposes" includes a simple test drive by a customer interested in purchasing the vehicle. It could be argued, as it is by Byrd, that the test-driving of a vehicle fits within the definition of a testing purpose given that the vehicle was driven by a prospective customer as a test under the most basic of definitions. On the other hand, it could be argued, as defendants do, that if any vehicle that had been taken for a test drive, even for one mile, were to lose its "new" status, it is likely that virtually no vehicle would be "new" and all would be demonstrators under the interpretation of MCL 257.11a proposed by Byrd. The statute is thus ambiguous.

Pursuant to MCL 8.3a, undefined statutory terms are to be given their plain and ordinary meaning, unless the undefined word or phrase is a term of art. We may consult a lay dictionary when defining common words or phrases that lack a unique legal meaning. *People v Thompson*, 477 Mich 146, 151-152; 730 NW2d 708 (2007). "Test" is defined in Merriam-Webster Dictionary as "a critical examination, observation, or evaluation." A "demonstration" is "an act of showing someone how something is used or done." "Purpose" is defined as, "the reason why something is done or used: the aim or intention of something." Thus, a motor vehicle used for testing and demonstration purposes is one whose aim or intention is to be used for critical evaluation and for showing how it is used.

Here, there is no indication that the motor vehicle purchased by Byrd had, as its aim or intention to be used for critical evaluation and for showing how it is used. While a test drive undoubtedly took place, the aim or intention of the vehicle was for it to be purchased by a third party; not to be use as an evaluation tool or for exhibiting how the vehicle was used. The test drive was merely incidental to the purpose for which the car was held.

Moreover, the title of the Michigan Motor Vehicle Code sets forth its purpose, in part, as "to provide for the registration, titling, sale, transfer, and regulation of certain vehicles operated upon the public highways of this state or any other place open to the general public . . . to provide for the imposition, levy, and collection of specific taxes on vehicles, and the levy and collection of sales and use taxes, license fees, and permit fees . . . ." See also, *Klinke v Mitsubishi Motors Corp*, 458 Mich 582, 589 n 5; 581 NW2d 272 (1998). The vehicle at issue was not registered or titled as a demonstrator. It was also not sold or transferred as a demonstrator. Byrd has provided no authority suggesting that every vehicle taken on a test drive falls under the definition of a demonstrator rather than a new vehicle. In contrast, defendants have provided the affidavit of a secretary of state employee to support their position. According to MCL 257.204(1), "[e]xcept as provided in this act, the secretary of state shall observe, enforce, and administer this act." The secretary of state is also provided with the authority to promulgate rules necessary to administer the act. MCL 257.204(2).

Russell Smith, a manager of the Michigan Department of State Dealer and Repair Regulation section of the Business Licensing Regulation and Division, provided an affidavit attesting that a vehicle is considered new until it is registered for on road use and that test-driving does not change the new status of a vehicle. Smith further swore that a demonstrator is a motor vehicle used for testing and demonstrating purposes and is titled as a demonstrator for tax-exempt purposes. As previously indicated, there is no indication that the Ford Focus at issue was titled as a demonstrator or was registered for on road use until it was purchased by Byrd.

In addition, the sales contract signed by Byrd and the application for title specifically state that the vehicle had 22 miles on it at the time of sale. Byrd was thus aware that the car had been driven 22 miles somewhere, by someone. The trial court did not err in finding that the Ford Focus qualified as a "new" vehicle.

Byrd next asserts that the trial court engaged in impermissible fact finding when it determined that the Ford Focus had not sustained damage that required disclosure. We disagree.

MCL 257.233b(2) provides:

> Except as provided in this subsection, a new motor vehicle dealer shall disclose in writing to a purchaser or lessee of a new motor vehicle, demonstrator, executive or manufacturer's vehicle, or program vehicle before entering into a sales contract or lease agreement that, after the vehicle completed the manufacturing process, the vehicle was damaged and repaired, including an itemization of repairs, if the dealer has knowledge of the damage and repairs and if the cost of the cumulative repairs, as calculated at the rate of the dealer's authorized warranty rate for labor and parts exceeds either 1 of the following:
>
> (a) Five percent of the manufacturer's suggested retail price of the vehicle.
>
> (b) Seven hundred fifty dollars in surface coating repairs or corrosion protection restoration or a combination of these items. If a new motor vehicle dealer fails to comply with this subsection, the purchaser or lessee shall retain all applicable

remedies available under article 2 of the uniform commercial code, 1962 PA 174, MCL 440.2101 to 440.2725.

The Ford Focus rear-ended a mini-van while on the test drive. The police report concerning the incident lists only Mr. Heinrich as being in the Ford Focus at the time of the accident. The report lists damage to the Focus as being level "01" (minor damage), but also indicates that the vehicle as not drivable. The mini-van was indicated to have three people in it, including Jimenez, sustaining damage at a level of "01" and being drivable. Officer Chris Wisniewski, who prepared the report, testified at deposition that his department does not require officers to put down the names of every passenger in a vehicle involved in an accident unless the passenger required medical attention. Wisniewski testified that he recalls a salesman being in the passenger seat of the vehicle being test-driven. Wisniewski further testified that he does not recall any extensive damage to the Ford Focus, which is why he listed the damage as "01", being very minor, and that the Ford was driven away. When questioned why the police report indicated that the Ford was not drivable, Wisniewski testified that it was an error on his part, explaining that the report is done on a touch screen and he sometimes accidentally presses the wrong bubble on the screen with his larger fingers.

Tim O'Connor, a Suburban Ford employee, attested in an affidavit that he accompanied Heinrich on the test drive and that he saw no damage to the vehicle after the accident. He swore that he drove the vehicle back to the dealership and took photographs of the Ford Focus when he arrived there.

At deposition, Jimenez testified that after the accident, she glanced at the front end of the car that hit them and did not see any damage. She testified that she was "quite amazed" there was none. According to Jimenez, the policeman at the scene called the Ford dealership to have them come and get their car. Jimenez described the damage to the minivan she was in as having the bumper "messed up" and "stuff hanging" but "no big deal."

Byrd nevertheless argues that a question of material fact exists concerning the extent of damage to the Ford Focus at the accident. Byrd provided the affidavit of Phillip Grismer, a purported expert in the automotive field who, upon examination of the documents and photos concerning the accident at issue (but not the Ford Focus itself or the other vehicle), prepared an opinion that the vehicle was not new when sold to Byrd and as to the likely value of the Ford Focus after the accident. Grismer's opinion was that the photographs of the Ford taken by Suburban Ford after the accident were not credible, that O'Connor's affidavit was not credible, and that because the police report listed the Ford Focus as having minor damage yet being not drivable, one could assume that the vehicle suffered more than minor damage. In his report, Grismer admits he did not see the Ford Focus after the accident but "assumed" a damaged hood, headlights, grille, and radiator for purposes of his damage calculation. These assumptions do not create a material question of fact. This Court has held that "an expert's opinion is objectionable where it is based on assumptions that are not in accord with the established facts. This is true where an expert witness' testimony is inconsistent with the testimony of a witness who personally observed an event in question, and the expert is unable to reconcile his inconsistent testimony other than by disparaging the witness' power of observation." *Badalamenti v William Beaumont Hosp-Troy*, 237 Mich App 278, 286; 602 NW2d 854 (1999)(citations omitted). We

would also note that Grismer's opinions were rendered prior to Officer Wisniewski's deposition having been taken.

In sum, the evidence presented to the trial court from all those who had seen the Ford Focus immediately after the accident unanimously opined that the vehicle suffered little to no damage. The vehicle was sold for approximately $21,000. Byrd presented no evidence that any actual, verifiable damages to the Ford Focus exceeded five percent of that price (MCL 257.233b(2)(a)) or that it required more than seven hundred fifty dollars in surface coating repairs or corrosion protection restoration or a combination of these items (MCL 257.233b(2)(b)). The trial court appropriately found that defendants did not violate MCL 257.233b. In similar fashion, absent Byrd's presentation of any evidence suggesting that repairs were, in fact, made to the Ford Focus after the accident, her argument that defendants engaged in spoliation of the evidence fails.

Byrd next contends that the trial court erred in dismissing her fraud and misrepresentation claims because the vehicle's involvement in a pre-sale accident should have been disclosed to her regardless of the amount of damages it may have incurred. To prove a claim of fraudulent misrepresentation, or common-law fraud, a plaintiff must establish that: (1) the defendant made a material representation; (2) the representation was false; (3) when the representation was made, the defendant knew that it was false, or made it recklessly, without knowledge of its truth, and as a positive assertion; (4) the defendant made it with the intention that the plaintiff should act upon it; (5) the plaintiff acted in reliance upon the representation; and (6) the plaintiff thereby suffered injury. *Roberts v Saffell*, 280 Mich App 397, 403; 760 NW2d 715 (2008) *aff'd* 483 Mich 1089; 766 NW2d 288 (2009). Byrd's argument on this issue relies primarily upon Grismer's opinion that the Ford Focus was not worth the amount she paid for it due to damages he "assumed" that the car suffered. Again, an expert's opinions based upon assumptions do not create a question of fact. *Badalamenti*, 237 Mich App at 286. This claim was thus appropriately dismissed.

The same holds true for Byrd's claim for breach of express and implied warranties and breach of warranty under the Magnuson-Moss Warranty Act. Byrd again relies upon Grismer's opinion to argue that because the parties have provided competing evidence as to whether the car was "new", summary disposition was not warranted. Her reliance on this opinion was imprudent.

Finally, the trial court did not err in dismissing Byrd's claim brought under the Michigan Consumer Protection Act (MCPA). Under the MCPA, "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful . . . ." MCL 445.903(1). However, the MCPA exempts any "transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." MCL 445.904(1)(a); *Liss v Lewiston-Richards, Inc*, 478 Mich 203, 205-06; 732 NW2d 514 (2007). The relevant inquiry to determine whether the above exemption applies is "whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited." *Id*. at 210.

Here, the Michigan Vehicle Code specifically requires that a dealer of motor vehicles obtain a dealer license and administration of the code is via the Secretary of State. MCL 257.204. The Secretary of State has the authority to examine the books and records of all

persons licensed to sell or buy vehicles that are required to be registered with the Secretary of State. MCL 257.213. The Motor Vehicle Code sets forth the requirements to obtain a dealer license (MCL 247.248), and prohibits certain conduct by dealers (e.g., MCL 257.248a). Moreover, the Michigan Vehicle Code provides for penalties for proscribed conduct. For example, MCL 248.257h provides, in part:

(1) A person who has engaged in conduct prohibited by subsection (2) is subject to 1 or more of the following penalties:
(a) Placement of a limitation on the person's license.
(b) Suspension or revocation of a license.
(c) Denial of an original or renewal application.
(d) A civil fine paid to the department in an amount not to exceed $25,000.00.
(e) Condition of probation.
(f) A requirement to take affirmative action, including payment of restitution.
(g) A letter of censure.
(2) The secretary of state may deny the application of a dealer after an appropriate hearing for the licensing of an individual as a salvage vehicle agent and refuse to issue or renew the license of an agent or may suspend or revoke an agent's license already issued if the secretary of state finds that the dealer, applicant agent, or licensed agent has done 1 or more of the following:
(a) Made a false statement of a material fact in the agent's application.
(b) Violated this chapter or a rule promulgated under this chapter, or assisted others in the violation of this chapter or a rule promulgated under this chapter.
(c) Purchased or acquired a salvage or scrap vehicle or salvageable part for a dealer for whom the agent is not licensed, or functioned as an agent for himself or herself alone and without respect to any dealer.
(d) Committed a fraudulent act in connection with purchasing or acquiring or otherwise dealing in vehicles of a type required to be registered under this act or in salvage or scrap vehicles or in vehicle parts.
(e) Engaged in a method, act, or practice that is unfair or deceptive, including the making of an untrue statement of a material fact.
(f) Violated a condition of probation.
(g) Failed to comply with the terms of a final cease and desist order.
(h) Failed to pay over funds or to surrender or return property received in the course of employment to a dealer or other person entitled to the funds or property.
(i) Acted as a dealer's agent by purchasing, acquiring, selling, or disposing of a vehicle while employed by a licensed dealer without reporting the purchase, acquisition, sale, or disposing of the vehicle to the dealer.
(j) Served in a managerial capacity for a dealer during the time another agent or employee of that dealer, acting under the direction and control of the dealer or licensed agent, committed a violation of this chapter or of a rule promulgated under this chapter or of a similar law in another state or jurisdiction.
(k) Acted for more than 1 party in a transaction without the knowledge of the other parties.
(*l*) Permitted an unlawful use of the agent's license.
(m) Accepted a commission, bonus, or other valuable consideration for the sale of a vehicle from a person other than the dealer under whom the agent is licensed.

(n) Possessed a vehicle or a vehicle part that has been confiscated under section 415 of the Michigan penal code, Act No. 328 of the Public Acts of 1931, being section 750.415 of the Michigan Compiled Laws, or of a similar law in another state or jurisdiction.

The sale of the motor vehicle by a licensed dealer to Byrd is thus a "transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." The specific transaction at issue is exempted from the MCPA. MCL 445.904(1)(a).

Due to the above, Byrd's claims for revocation and rescission have no basis. In addition, because Byrd concedes that her claims against Ford Credit are derivative of her claims against Suburban, given our resolution of the matters against Suburban, Byrd's claims against Ford Credit have also been appropriately dismissed.

Affirmed.


/s/ Deborah A. Servitto
/s/ Kurtis T. Wilder
/s/ Mark T. Boonstra