*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

WESLEY CHARLES,

Plaintiff-Appellant,

v

TRINITY HEALTH-MICHIGAN, doing business as
ST. MARY MERCY LIVONIA, MENDELSON
ORTHOPEDICS, P.C., doing business as
MENDELSON-KORNBLUM-ORTHOPEDIC &
SPINE SPECIALISTS, and JEFFREY
MENDELSON, M.D.,

Defendants-Appellees.

UNPUBLISHED
February 20, 2025
10:48 AM

No. 369009
Wayne Circuit Court
LC No. 21-014061-NH

Before: LETICA, P.J., and GARRETT and FEENEY, JJ.

LETICA, P.J. (*dissenting*).

I respectfully dissent. I would affirm the trial court's underlying order granting summary disposition to defendants Mendelson Orthopedics, P.C. (doing business as Mendelson-Kornblum-Orthopedic & Spine Specialists) and Dr. Jeffrey Mendelson, M.D. (Dr. Jeffrey) (collectively, Mendelson defendants) under MCR 2.116(C)(10) (no genuine issue of material fact).

## I. FACTUAL SUMMATION

As the majority notes, plaintiff had surgery on his right knee performed by Dr. Jeffrey's brother, Dr. David Mendelson, M.D. (Dr. David). During the surgery, a catheter was inserted into plaintiff's knee to administer pain medicine. Before plaintiff was discharged, a nurse attempted to remove the catheter, and it snapped with two inches of catheter poking out from plaintiff's leg. A physician's assistant was brought in to remove plaintiff's catheter but was also unsuccessful. Although not plaintiff's treating surgeon, Dr. Jeffrey was then asked to assist in the removal of the catheter. When Dr. Jeffrey attempted to remove the remaining catheter, plaintiff's son filmed Dr. Jeffrey's actions over his objection. During Dr. Jeffrey's removal attempt, he heard a snap. Dr. Jeffrey believed that he removed the remainder of the catheter. Nonetheless, he ordered an x-ray because the catheter had a radio marker or "radiopaque" mark, and the x-ray would

demonstrate if there was any part of the catheter present in plaintiff's leg. But, the x-ray did not detect any catheter tubing in plaintiff's leg. Nonetheless, Dr. Jeffrey notified Dr. David of the possibility that a piece of broken catheter remained in plaintiff's leg. Plaintiff did not initially report pain or discomfort in his leg. Within a couple of months of the surgery, plaintiff discussed the possibility of a portion of the catheter remaining in his leg with Dr. David. Dr. David advised plaintiff that the catheter could remain in his leg without incident or it could be surgically removed. Plaintiff eventually consulted with his primary care physician, and an ultrasound detected a portion of the catheter in his leg. The catheter was later removed in two procedures.

Dr. Raymond Vance, a board-certified orthopedic surgeon licensed in California since 1974, testified as plaintiff's expert regarding the breach of the standard of care by Dr. Jeffrey. Dr. Vance stopped using pain pump catheters 15 to 20 years earlier. In preparation for the deposition, he reviewed the manufacturer materials pertaining to pain pumps and learned of a black mark on the tip of the catheter; he was unaware if it was radiopaque or not. In the depositions he reviewed, Dr. Vance recalled that there was testimony that the catheter was marked with a radiopaque line, but he could not find evidence to confirm this. When the catheter was marked with a radiopaque line, the line was generally present throughout the length of the catheter. A radiopaque marker on a foreign body that was placed within a patient was designed to be visible on a radiograph or film. Dr. Vance testified that a black mark was on plaintiff's catheter, but he did not know if it was radiopaque or if it was placed on both tips of the catheter. Although Dr. Vance had not recently placed a catheter, he never encountered any resistance when removing one. When Dr. Vance used catheters, it was to drain blood, not inject material, and the catheter's black line was visible to the naked eye. In his experience and research, Dr. Vance could not describe what the radiopaque markers looked like on "these catheters."

Dr. Vance testified that a radiopaque marker would generally appear on an x-ray, and he was unfamiliar with the scenario where a foreign body with a radiopaque marker was left in a patient and undetected by x-ray. To remove a catheter, Dr. Vance would grasp it in his hand and take several steps backward. When applying longitudinal traction on the catheter, there was no difficulty or resistance during the catheter's removal. In the present case, Dr. Vance had no objection to the standard of care in the placement of plaintiff's catheter and opined that its placement caused no nerve or muscular damage, but may have caused some scarring. Dr. Vance did not conclude that Dr. David's treatment of plaintiff breached the standard of care.

Dr. Vance agreed that catheter removal was generally easy and could not reach a conclusion regarding why this catheter broke apart during the nurse's removal or the subsequent difficulty in Dr. Jeffrey's attempted removal. He offered a possibility that a nonpenetrating, but surrounding stitch may have "looped" the catheter. Dr. Vance acknowledged that he did not know the exact reason this occurred. He also did not fault Dr. Jeffrey for the difficulty in removing the catheter or for failing to ascertain the reason for the difficulty. Additionally, when posed with a hypothetical, Dr. Vance would not have faulted Dr. Jeffrey for advising plaintiff to simply seek "follow-up" care with his surgeon after encountering difficulty when attempting to remove the catheter.

Ultimately, during Dr. Jeffrey's attempted removal, the catheter broke under the plaintiff's skin. Nonetheless, Dr. Vance did not criticize the degree of force or tension used to remove the catheter and did not opine that the standard of care required Dr. Jeffrey make an incision to remove

the catheter. Dr. Vance acknowledged Dr. Jeffrey's decision to order an x-ray to determine if a portion of the catheter remained in plaintiff's leg, and the x-ray report[1] did not detect a foreign body through a radiopaque marker. Dr. Vance did not specifically answer whether it was reasonable to rely on an x-ray to conclude that there was no foreign body remaining in a body in light of the lack of a radiopaque marker. Instead, he characterized it as "persuasive evidence." Nonetheless, Dr. Vance questioned Dr. Jeffrey's actions in light of the resistance in removing the catheter, the snapping during the attempted removal, the failure to remove 25 centimeters (cm)[2] of catheter, and the failure to remove the radiopaque tip.

Dr. Vance acknowledged that another doctor, Dr. David Heidt, ultimately removed the catheter with the radiopaque tip, but Dr. Vance could not render an opinion regarding why it did not appear on an x-ray. Dr. Vance noted there was testimony that the catheter had a radiopaque tip, but Dr. Vance was unsure because he used catheters with the radiopaque line throughout the catheter's length. When asked if the standard of care required that Dr. Jeffrey order an ultrasound, Dr. Vance answered that it was a "reasonable thing to do." And, Dr. Vance concluded the failure to order an ultrasound unnecessarily led to the object remaining in plaintiff for a couple of months.

Dr. Vance learned Dr. David saw plaintiff on July 3, 2019, nearly two months after the surgery. At that time, Dr. David acknowledged that there was scarring because of "possible residual catheter," but plaintiff did not indicate that the catheter remnant bothered him "significantly." Nonetheless, Dr. David failed to order an ultrasound to confirm the presence of the catheter. Yet, Dr. Vance did not conclude that Dr. David breached the standard of care by this omission. Instead, Dr. Vance opined that if Dr. Jeffrey had ordered the ultrasound, the catheter would have been removed five months earlier.

In October 2019, Dr. Heidt removed a portion of the catheter. But an additional piece of the catheter remained in plaintiff after the procedure. This piece of catheter was not detected on an ultrasound or an MRI. Nonetheless, Dr. Heidt performed a second procedure to remove the last piece of catheter.

Ultimately, the trial court granted summary disposition to the Mendelson defendants, concluding that plaintiff failed to "establish that, but for Dr. Jeffrey Mendelson's alleged failure to order an ultrasound, the retained catheter would have been removed sooner." The trial court also denied plaintiff's motion for reconsideration.

## II. STANDARD OF REVIEW

The trial court's ruling on a motion for summary disposition is reviewed de novo. *Charter Twp of Pittsfield v Washtenaw Co Treasurer*, 338 Mich App 440, 448; 980 NW2d 119 (2021). A motion for summary disposition premised on MCR 2.116(C)(10) tests the factual sufficiency of

---

[1] Dr. Vance did not review the actual radiograph.

[2] Dr. Vance testified that between 15 to 25 cm of catheter was appropriate to place, and he had no objection to the amount of catheter used. Dr. Vance could not definitively testify if the catheter removed by Dr. David Heidt was stretched.

the complaint. *Id*. at 449. The moving party must identify and support the issues to which the moving party contends there is no genuine issue of material fact, and the affidavits, pleadings, depositions, admissions, and other documentary evidence submitted with the motion must be examined. *Id*.

When responding to a motion for summary disposition, a party with the burden of proving causation must "set forth specific facts that would support a reasonable inference of a logical sequence of cause and effect." *Skinner v Square D Co*, 445 Mich 153, 174; 516 NW2d 475 (1994). Causation may be shown circumstantially, but the adequacy of circumstantial proof "must facilitate reasonable inferences of causation, not mere speculation." *Id*. at 164. Causation evidence must "exclude other reasonable hypotheses with a fair amount of certainty." *Craig v Oakwood Hosp*, 471 Mich 67, 87-88; 684 NW2d 296 (2004) (quotation marks and citation omitted). "Our case law requires more than a mere possibility or a plausible explanation." *Id*. at 87. That is, "litigants do not have any right to submit an evidentiary record to the jury that would allow the jury to do nothing more than guess." *Skinner*, 445 Mich at 174.

## III. ANALYSIS

Plaintiff contends that the trial court erred in granting the Mendelson defendants' dispositive motion because factual issues existed regarding proximate causation. I disagree.

Four elements must be established for a plaintiff to prove a medical malpractice claim:

(1) the applicable standard of care, (2) breach of that standard of care by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury. [*Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016) (quotation marks and citation omitted).]

"Expert testimony is required to establish the standard of care and to demonstrate the defendant's alleged failure to conform to that standard." *Decker v Rochowiak*, 287 Mich App 666, 685; 791 NW2d 507 (2010). A qualified expert witness may testify in the form of an opinion if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. [MRE 702.]

An expert's testimony is insufficient if it merely establishes a connection between conduct and an injury for purposes of establishing causation in a medical malpractice action. *Teal v Prasad*, 283 Mich App 384, 392; 772 NW2d 57 (2009). "[A] plaintiff cannot establish causation if the connection made between the defendant's negligent conduct is speculative or merely possible." *Id*. And, "an expert's opinion is objectionable where it is based on assumptions that are not in accord with the established facts." *Badalamenti v William Beaumont Hosp-Troy*, 237 Mich App 278, 286; 602 NW2d 854 (1999). That is, an expert witness may not give testimony inconsistent with that of a witness that personally observed the event and where the expert's inconsistent testimony results in the disparagement of the witness's power of observation. *Id*.

In *Badalamenti*, this Court noted that the treating physician who performed an echocardiogram observed and studied the echocardiogram while it was being conducted. Subsequent echocardiograms performed on the plaintiff confirmed the initial findings. *Id*. at 288. The plaintiff's expert was skeptical that the first echocardiogram showed relatively normal function. And, he acknowledged that, if his skepticism was incorrect, his opinion was wrong, flawed, and incorrect. *Id*.

This Court explained that the testimony was insufficient:

[T]he record clearly reflects that [the expert] had no reasonable basis in evidence to support his position that plaintiff's left ventricular heart wall function was significantly damaged on March 16, which he agreed was the pertinent time frame and the definitive component for cardiogenic shock. Rather, as he explained, he based his opinion on his skepticism and disparagement of [the doctor's] findings. This testimony was legally insufficient to support [the] expert opinion, through which plaintiff's liability theory was presented, that plaintiff was in cardiogenic shock on March 16. [*Id.* at 288-289.]

After a review of Dr. Vance's testimony, I conclude that he failed to present expert admissible testimony to establish a breach of the standard of care or proximate causation. Dr. Vance had not used catheters for the last 15 to 20 years in his surgical practice. In the present case, Dr. Vance was unclear, from the medical records, whether a radiopaque marker was even used and whether it reflected a radiopaque tip or a line. Additionally, Dr. Vance failed to explain why a radiopaque tip on a catheter was not observable on an x-ray. And, he did not definitively respond that the failure to order an ultrasound constituted a breach of the standard of care. Rather, under the circumstances, Dr. Vance determined that an ultrasound was reasonable. Yet, he declined to state that Dr. Jeffrey's referral of the matter back to Dr. David, as the treating surgeon, was improper. Furthermore, when plaintiff returned to Dr. David for treatment within two months of the surgery, Dr. Vance expressly concluded that Dr. David did not breach the standard of care by failing to order an ultrasound, despite the knowledge that a portion of the catheter possibly remained in plaintiff's leg. Indeed, during plaintiff's July 2019 follow-up appointment, Dr. David was fully aware that plaintiff might have some scar tissue and residual catheter in his leg. Although Dr. David determined any remaining catheter "was benign and [plaintiff] could live with it, if it doesn't bother him," Dr. David offered to conduct exploratory surgery to determine whether any catheter remained and remove it. Plaintiff declined and the catheter was not removed until months later after plaintiff reported an increase in his pain.

Although Dr. Vance's testimony suggests that Dr. Jeffrey's failure to order an ultrasound was the reason why the catheter remained in plaintiff's leg, there are no "facts in evidence to support" his opinion. *Skinner*, 445 Mich at 173. Rather, plaintiff's argument that it would have been removed sooner is speculative. Accordingly, I would affirm the trial court's order granting summary disposition to the Mendelson defendants because plaintiff failed to demonstrate there was a connection between Dr. Jeffrey's action and plaintiff's injury. *Teal*, 283 Mich App at 392.

/s/ Anica Letica