*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

THE ESTATE OF DONALD GRACEY, SR.,
deceased, by CAROLYN GRACEY, personal
representative,

        Plaintiff-Appellant/Cross-Appellee,

v

WOODWARD HILLS JOINT VENTURE d/b/a
WOODWARD HILLS NURSING CENTER, a
Michigan co-partnership,

        Defendant-Appellee/Cross-Appellant.

UNPUBLISHED
November 9, 2023

No. 361082
Oakland Circuit Court
LC No. 2019-174588-NH

Before: CAVANAGH, P.J., and RIORDAN and PATEL, JJ.

PER CURIAM.

Plaintiff Carolyn Gracey, the wife and estate representative of the decedent, Donald
Gracey, appeals as of right the trial court's order for no cause of action against defendant
Woodward Hills Joint Venture. On appeal, plaintiff challenges three evidentiary rulings by the
trial court during the eight-day jury trial. Defendant has filed a cross-appeal, arguing that if this
Court rules that plaintiff is entitled to a new trial, then plaintiff should not be able to proceed on
three of her four theories of the case. We disagree with plaintiff and affirm the trial court without
reaching the merits of the cross-appeal.

## I. BACKGROUND FACTS

On June 14, 2019, plaintiff filed her complaint against defendant, alleging as follows. On
March 15, 2016, Gracey was admitted to St. Joseph-Mercy Oakland Hospital, where he was treated
for a variety of issues such as kidney failure. During his hospitalization, he had a "PEG tube
administered due to his dysphasia," and the PEG tube remained in place when he was discharged
from the hospital on March 25, 2016, and transferred to defendant for further management.
Defendant noted that Gracey's "nourishment type" was supposed to be "tube feeding plus pureed
diet Honey thick liquids." On March 27, 2016, at 7:00 a.m., "a staff member noted a large episode
of emesis," which resulted in Gracey being immediately transferred back to the hospital, where

-1-

"he was found to be hypoxic and gagging." Critically for the purposes of this case, Gracey was found to have eggs in his mouth, contrary to his feeding instructions that he not be fed solid food. Ultimately, Gracey passed away on April 10, 2016. Plaintiff alleged that defendant was responsible for the death because Gracey "was given eggs and/or other food despite his dysphasia, PEG tube, and contrary to [defendant's] own assessment and orders. As a result, he gagged, suffered hypoxic decline, uncured aspiration pneumonia, required intubation and subsequently died."

On January 6, 2021, defendant moved for summary disposition under MCR 2.116(C)(10), arguing that plaintiff could not establish causation because "Plaintiff has offered no reliable medical or scientific evidence to support Dr. Kress's opinion that, more likely than not, the proximate cause of Mr. Gracey's death was an aspiration of eggs (as opposed to the documented tube feeding he was receiving)." The same day, defendant filed a separate motion for summary disposition under MCR 2.116(C)(10), arguing that plaintiff could not establish a breach of the standard of care because, in relevant part, "[t]here is **NO** indication in the Woodward Hills records or the testimony of the nursing staff that Mr. Gracey was provided eggs or *any* food on the morning in question." On March 2, 2021, the trial court denied the motions for summary disposition.

Trial began on March 1, 2022, and ended on March 15, 2022, with the trial itself occurring on eight days during that timeframe. The first relevant witness was April Cope, who was employed by defendant as a licensed practical nurse in March 2016. Cope agreed that according to her progress notes of March 27, 2016, she called plaintiff that morning to report that Gracey was being transferred to the hospital. However, Cope had no independent recollection of that telephone call. Cope explained that she was working the night shift, from 11:00 p.m. until 7:30 a.m., when the events at issue occurred, and that she was responsible for Gracey's room, among others. At 7:00 a.m., Cope documented that Gracey had difficulty breathing and an oxygen saturation rate of 73%, and she consequently contacted a nurse practitioner, who informed her that Gracey should be transferred to the hospital. Other documentary evidence referenced by plaintiff's counsel indicated that EMS was contacted at 7:02 a.m. Cope agreed that her standard procedure for discovering a patient in Gracey's state would have been to check for "gastric residual" to determine whether there was "undigested food sitting," and that her notes indicated that Gracey had "no noted gastric residual." Cope testified that Gracey did not receive any food from her, that the kitchen is closed on her shift, and that she could not explain why an emergency room notation indicated that there was food in Gracey's mouth. Specifically, with regard to the kitchen, Cope explained that it is ordinarily open between 8:00 a.m. and about 6:30 p.m., and that neither food trays nor snacks are provided to patients during the night shift.[1] Finally, Cope agreed that it is relatively common for a patient who is being fed via a PEG tube to vomit.[2]

---

[1] She later testified that none of the nurses during the night shift had the ability to provide eggs to patients because the kitchen was closed.

[2] A PEG tube was described by one witness as "a percutaneous tube that is inserted through the abdomen directly into the belly."

The following day, on re-cross examination, plaintiff's counsel reviewed extensive medical notes from the night in question indicating that Cope did not provide direct care to Gracey that night, contrary to her testimony. When confronted with this evidence, Cope admitted that she did not provide direct care to Gracey, other than during the emergency at about 7:00 a.m.[3] In addition, counsel somewhat unsuccessfully tried to elicit testimony from Cope indicating that the kitchen could have opened before 7:00 a.m. that day because it was Easter Sunday:

Q. Okay. You told this jury means aren't served or available until after 8:00 o'clock, isn't that your testimony? Wasn't that your testimony before the jury?

A. Yes.

Q. Okay. Can you please pull up K please? May I approach?

THE COURT: You may.

Q. This is the document board that Mr. Moran had up. I want to highlight the bottom part right here where it says open breakfast.

It says open breakfast was available in the main dining rooms from 7:00 a.m. to 9:00 a.m. Do you see that?

A. Yes.

Q. That means the residents could go down to the kitchen eat by 7:00, at 7:00 in the morning, correct?

A. Yes.

Q. So when you told this jury that food isn't served until 8:00 p.m., 8:00 a.m. under oath, that wasn't true, was it?

A. That was my knowledge of it. I never seen a dining room even open at 7:00 a.m. like this document says.

Q. That was your knowledge of it.

A. That was my knowledge of the kitchen times because they're not open at 7:00 a.m.

\* \* \*

---

[3] We note that Cope repeatedly testified that she did not remember the night in question, and her testimony was typically phrased in terms of what her ordinary practice would have been, not what she actually did.

Q. And you've worked in Woodward Hills for a number of years, correct?

A. Yes.

Q. And on holidays, such as Easter Sunday, they provide special things for residents and their families regarding meals, correct? Like a Sunday brunch. You're familiar with that, correct?

A. Yes.

Q. Okay. So on Easter Sunday there's a special thing that is planned for the residents and their families to come into the facility and have brunch, correct?

A. Yes.

Q. And they don't do that normally, do they on other Sundays, is that true?

A. That's true.

Q. Okay. And the day that this occurred was Easter Sunday, are you familiar with that?

A. Yes.

Q. Are you aware of that?

A. Yes.

Q. Okay. So on that day the kitchen would have to get ready for that brunch for residents and their families much earlier than they normally prepare meals, isn't that true?

MR. MORAN: Object, foundation.

THE WITNESS: Yes.

* * *

A. And so in that case it's entirely possible that they might do meal trays a little bit early to get ready for that brunch, isn't that true?

MR. MORAN: Object, object --

THE WITNESS: No, I'm not --

MR. MORAN: -- object to

THE COURT: Ms. Cope --

MR. JENKINS:  No further questions.

THE COURT:  -- you have to wait until

THE WITNESS:  I mean it happens at the same time.

\* \* \*

MR. JENKINS:  I'll withdraw it.

Plaintiff testified that on March 26, 2016, she spent the day with Gracey, and did not return home until midnight.  However, she went shopping at some point during the day.  She was aware that Gracey was not allowed to be fed solid food, and the clear implication of her testimony is that he did not receive solid food in her presence.  Plaintiff testified that on the morning of March 27, she received a telephone call from a female nurse employed by defendant, and the nurse "said we're taking your husband to the hospital.  He's choking.  They fed him eggs."  Plaintiff immediately called her son Michael to inform him about the situation, then she went to the hospital.

Plaintiff's counsel asked, "And did the ER nurse initiate a conversation with you?"  Defendant's counsel objected on the basis of hearsay, and the trial court told plaintiff's counsel to establish a foundation.  Eventually, plaintiff's counsel asked plaintiff about what the nurse said, and defendant's counsel again raised a hearsay objection, stating that "there's still an . . . unidentified individual from a non-party hospital providing information."  Plaintiff's counsel responded that the hearsay was admissible under MRE 803(4), which concerns statements for treatment of medical diagnosis, and MRE 803(24), the catchall provision.  Plaintiff's counsel also argued that the hearsay was admissible under MRE 803(1), which concerns present-sense impressions.  The trial court ruled that the hearsay was inadmissible.[4]  Shortly thereafter, plaintiff's counsel asked plaintiff about what a doctor in the hospital said to her about Gracey's condition, defendant's counsel objected and "incorporate[d] the same arguments" as before, and the trial court sustained the objection.[5]

Michael Gracey testified that when he was at the hospital on the morning of March 27, he overheard a nurse tell his mother something about his father's medical condition.  The trial court sustained the hearsay objection of defendant's counsel.

The following day, defendant presented, over plaintiff's objection, the video-recorded de bene esse deposition testimony of Dr. Marsh-Senic.  Dr. Marsh-Senic was qualified as an "emergency room physician" expert.  In addition, she was the doctor who was actually responsible for treating Gracey when he first arrived at the hospital.  She opined that Gracey vomited and choked on tube feed, not solid food.

---

[4] According to plaintiff's deposition, the ER nurse said, "I understand they fed him eggs."

[5] Plaintiff's deposition testimony implies that the doctor told her that eggs were obstructing Gracey's throat.

Defendant presented three other expert witnesses, none of whom are relevant for this appeal. During closing arguments, plaintiff's theory of the case was that defendant's staff fed Gracey eggs, which ultimately caused his death. Defendant's theory of the case was that the material found in Gracey's mouth was tube feed, which can resemble eggs in color and substance, and that he could not have been fed breakfast by 7:00 a.m. The jury apparently agreed with defendant and found no cause of action.

## II. HEARSAY

Plaintiff argues that the hearsay statements of the ER nurse and a doctor in the hospital indicating that Gracey consumed eggs should have been admitted under one or more hearsay exceptions of MRE 803. We conclude that the trial court did not err by ruling that none of the hearsay exceptions applied.

A trial court's decision to exclude evidence is reviewed for an abuse of discretion. *Dep't of Transp v VanElslander*, 460 Mich 127, 129; 594 NW2d 841 (1999). "An abuse of discretion occurs when a trial court's decision is not within the range of reasonable and principled outcomes." *Sys Soft Technologies, LLC v Artemis Technologies, Inc*, 301 Mich App 642, 650; 837 NW2d 449 (2013) (quotation marks and citation omitted).

### *Hearsay Statement of ER Nurse*

In this case, plaintiff testified that upon receiving the telephone call explaining that Gracey was being transported to the hospital, she immediately drove to the hospital, which was less than a mile from her location at the time. She drove through the gate, parked the car, entered the hospital through the double doors, and informed the security guard her name. At some point, her son Michael joined her at the hospital.[6] Plaintiff further testified that she encountered an ER nurse who explained something to her about Gracey's medical status. Defendant immediately objected and, following arguments from the parties about the applicability of MRE 803(1), (4), and (24), the trial court ruled that the statement from the ER nurse was inadmissible under all three hearsay exceptions, reasoning as follows:

> Uh, the – the Plaintiff has argued that either it comes in under 803(1) present sense impression. The Court – it does not believe that it does come in under 803(1) present sense – sense impression. As, uh, the event or condition made while a declarant was perceiving the event or condition or immediately thereafter. Uh, and don't – I don't believe that applies whatsoever in an emergency room situation.
>
> Uh, the medical records, the Court has already ruled that the medical record – that this statement was not used for the treatment or diagnosis of the decedent in this matter. Uh, Plaintiff also argues other exceptions. Uh, and the Court does not believe that the statement, uh, does come in as it does not have an equivalent

---

[6] It is unclear whether plaintiff and Michael drove to the hospital together or separately.

circumstantial guarantee of trustwort – worthiness.  Uh, so at that time, your objection is sustained.

Later, plaintiff's counsel asked Michael about the conversation that he overheard in the hospital between his mother and the ER nurse, and the trial court sustained defendant's hearsay objection for the same reasons as before.  On appeal, the parties do not dispute that both plaintiff and Michael would have essentially testified that the ER nurse said that Gracey was fed eggs.

" 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  MRE 801(c).  "Hearsay is not admissible except as provided by these rules."  MRE 802.  MRE 803 provides, in relevant part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> (1) Present Sense Impression.  A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.
>
> ***
>
> (4) Statements Made for Purposes of Medical Treatment or Medical Diagnosis in Connection with Treatment.  Statements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment.
>
> ***
>
> (24) Other Exceptions.  A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact, (B) the statement is more probative on the point for which it is offered than any other evidence that the proponent can procure through reasonable efforts, and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.  However, a statement may not be admitted under this exception unless the proponent of the statement makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

The trial court did not abuse its discretion by ruling that the hearsay statement of the ER nurse was inadmissible under MRE 803(1).  "This Court is not overly literal in construing the phrase 'immediately thereafter' and will allow a statement made less than a minute or even several minutes after the event observed to qualify under this exception."  *People v Bowman*, 254 Mich

App 142, 145; 656 NW2d 835 (2002). A statement made 16 minutes after the perceived event may satisfy MRE 803(1). See *People v Hendrickson*, 459 Mich 229, 237; 586 NW2d 906 (1998) (opinion by KELLY, J.). However, a statement made "at least several, and possibly as many as 30, minutes" after the perceived event may not satisfy MRE 803(1). See *Hewitt v Grand Trunk Western R Co*, 123 Mich App 309, 317; 333 NW2d 264 (1983).[7]

Here, plaintiff does not expressly identify the time that elapsed after the perceived event, i.e., when the ER nurse allegedly observed that Gracey was fed eggs, and the statement to plaintiff about that event. While we cannot identify any caselaw requiring a party to identify a specific number of minutes, the tentative language in *Hewitt* suggests that a party must be able to narrow the elapsed time to a relatively short period. Plaintiff did not do so here. At most, the transcript indicates that plaintiff conversed with the ER nurse shortly after she arrived at the hospital. However, given that plaintiff had to drive to the hospital, pass through security, and at some point, meet her son Michael before conversing with the ER nurse, it is reasonable to assume that 20 or even 30 minutes may have elapsed between the perceived event and the hearsay statement. In other words, the nurse may have observed that Gracey was apparently fed eggs as soon as he arrived at the hospital, and then several minutes later, informed plaintiff about this fact once she and her son arrived at the hospital. This elapsed time, on the record before this Court, may have been as short as 10 minutes (or less) or as long as 30 minutes (or more). Bearing in mind the general boundaries that 16 minutes is acceptable but 30 minutes is too long, and bearing in mind that the elapsed time reasonably could have been either inside or beyond these boundaries, the trial court did not abuse its discretion by ruling that the hearsay statement was inadmissible under MRE 803(1).

The trial court did not abuse its discretion by ruling that the hearsay statement was inadmissible under MRE 803(4). Generally, hearsay statements are only admissible under MRE 803(4) when the declarant is seeking medical treatment or medical diagnosis. See *People v McElhaney*, 215 Mich App 269, 280; 545 NW2d 18 (1996) ("Under MRE 803(4), the declarant must have the self-interested motivation to speak the truth to treating physicians in order to receive proper medical care, and the statement must be reasonably necessary to the diagnosis and treatment of the patient."); *People v Mahone*, 294 Mich App 208, 214-215; 816 NW2d 436 (2011) ("Statements made for the purpose of medical treatment are admissible pursuant to MRE 803(4) if they were reasonably necessary for diagnosis and treatment and if the declarant had a self-interested motivation to be truthful in order to receive proper medical care."). Federal courts have interpreted Fed R Evid 803(4) as "limited to statements made by the one actually seeking medical treatment or care." *Field v Trigg Co Hosp, Inc*, 386 F3d 729, 736 (CA 6, 2004).

Here, the declarant of the hearsay statement at issue was the ER nurse who was responsible for treating Gracey. The hearsay statement was not provided by Gracey himself to a medical provider. That is, the hearsay statement was not provided by the individual seeking medical

---

[7] "Although cases decided before November 1, 1990, are not binding precedent, MCR 7.215(J)(1), they nevertheless can be considered persuasive authority[.]" *In re Stillwell Trust*, 299 Mich App 289, 299 n 1; 829 NW2d 353 (2012).

treatment or medical diagnosis on behalf of himself or herself, or another person. Thus, the trial court correctly ruled that it was inadmissible under MRE 803(4).[8]

The trial court did not abuse its discretion by ruling that the hearsay statement was inadmissible under MRE 803(24). With regard to this rule of evidence, our Supreme Court has explained:

> To be admitted under MRE 803(24), a hearsay statement must: (1) demonstrate circumstantial guarantees of trustworthiness equivalent to the categorical exceptions, (2) be relevant to a material fact, (3) be the most probative evidence of that fact reasonably available, and (4) serve the interests of justice by its admission. [*People v Katt*, 468 Mich 272, 290; 662 NW2d 12 (2003).]

The third requirement "is a high bar and will effectively limit use of the residual exception to exceptional circumstances. For instance, nonhearsay evidence on a material fact will nearly always have more probative value than hearsay statements, because nonhearsay derives from firsthand knowledge." *Id*. at 292. The third requirement is apparently a reiteration of the language of MRE 803(24) that "the statement is more probative on the point for which it is offered than any other evidence that the proponent can procure through reasonable efforts."

Plaintiff failed to satisfy this requirement because she did not explain, either below in the trial court or on appeal in this Court, why the ER nurse herself reasonably could not have been called as a witness. That is, plaintiff did not show that the hearsay statement was more probative than other nonhearsay evidence, i.e., the firsthand testimony of the ER nurse, that could have been procured by other means. In fact, caselaw from this Court indicates that it is a requirement for the purposes of MRE 803(24) that the declarant be unable to testify. See *People v Lee*, 243 Mich App 163, 178; 622 NW2d 71 (2000) (explaining that "the reason the declarant cannot testify" is a factor to be considered in deciding whether hearsay is admissible under MRE 803(24)). Because plaintiff did not explain why the ER nurse reasonably could not be called as a witness to testify on the basis of her firsthand knowledge, the trial court did not abuse its discretion by ruling that the hearsay statement was inadmissible under MRE 803(24).

---

[8] Plaintiff, citing *People v Yost*, 278 Mich App 341; 749 NW2d 753 (2008), argues that MRE 803(4) is not strictly limited to statements made by the individual seeking medical diagnosis or treatment. In *Yost*, this Court stated that "the hearsay exception stated in MRE 803(4) is not limited to statements made by the person being diagnosed or treated," and that as a result, "the witness should have been permitted to rely on statements by third parties, such as Monique's parents and teachers." *Id*. at 362 n 2.

*Yost* stands for the proposition that MRE 803(4) applies to statements made *to* a medical provider on behalf of medical treatment or medical diagnosis for a personal relation. For example, the statements of a parent of an injured child to the doctor may be admissible under MRE 803(4). *Yost* does not stand for the proposition that the statements *of* a medical provider may be admissible under that rule.

*Hearsay Statement of Doctor*

Plaintiff also argues that the hearsay statement of a doctor at the hospital indicating that Gracey was fed eggs was admissible under MRE 803(1), (4), and (24). In this regard, plaintiff's counsel elicited the following testimony from her immediately after the trial court sustained defendant's objection to the hearsay statement of the ER nurse:

Q. Now, I know the Court has ruled and -- and --and -- about discussion with the emergency room nurse. Did you have any other discussion with any medical -- other medical personnel at St. Joe's regarding what the discussion may have been with the emergency room nurse at any time?

A. Uh, yes.

Q. Okay. Do you remember talking to any physicians?

A. Yes.

* * *

Q. I mean, the doctor. Was there a doctor that talked to you?

A. Yes.

Q. Okay. What type of doctor was he?

A. The -- the people that put the -- the peg in. The doctor that put the -- the peg in.

Q. So do -- do you do you -- did -- how do you know who this doctor was?

A. It was Doctor McKenzie (ph) because he had did a procedure for me in the past.

Q. Okay. So, do you remem -- you remember this doctor speaking to you about Donald's treatment?

A. Yes.

Defendant's counsel objected on the basis of hearsay and, following brief arguments from the parties' counsel that were consistent with their earlier arguments regarding the hearsay statement of the ER nurse, the trial court sustained the objection. On appeal, the parties do not dispute that the conversation between plaintiff and the doctor occurred at some point after the doctor completed a procedure involving the placement of a medical device, a catheter, in Gracey to treat his medical issues, and that the doctor told plaintiff that he found eggs in Gracey's throat.

The trial court did not abuse its discretion by ruling that the hearsay statement of the doctor was inadmissible for essentially the same reasons articulated above as to the hearsay statement of the ER nurse. With regard to MRE 803(1), there is no indication in the record as to how long after

the doctor perceived the event that he communicated with plaintiff. The most that may reasonably be inferred from the transcript and the parties' representations on appeal is that plaintiff was waiting in the hospital for an undetermined amount of time and, sometime after the doctor completed the procedure on Gracey, he told plaintiff that he found eggs in Gracey's throat. This statement may have occurred 10 minutes or 30 minutes after the procedure. In the absence of anything in the record to indicate that the timeframe was closer to 10 minutes than 30 minutes, or even greater, the trial court did not abuse its discretion by ruling that the hearsay statement was inadmissible under MRE 803(1).

With regard to MRE 803(4), as explained, that rule of evidence applies to statements made to a medical provider on behalf of medical treatment or medical diagnosis for the declarant or a personal relation. See *Yost*, 278 Mich App at 362 n 2. It does not apply to statements made by a medical provider. Finally, with regard to MRE 803(24), plaintiff has not explained why the doctor reasonably could not have been called to directly testify about his firsthand knowledge of what he found in Gracey's throat. See *Lee*, 243 Mich App at 178. The trial court did not abuse its discretion by ruling that the hearsay statement was inadmissible under MRE 803(4) and (24).

## III.  MEAL SCHEDULE

Plaintiff argues that the trial court erred by allowing defendant to rely upon the "breakfast schedule" during its closing argument. We disagree.

"This Court reviews the trial court's ruling with regard to closing arguments for an abuse of discretion." *People v Lacalamita*, 286 Mich App 467, 472; 780 NW2d 311 (2009).

"It is settled that error requiring reversal may only be predicated on the trial court's actions and not upon alleged error to which the aggrieved party contributed by plan or negligence." *Lewis v LeGrow*, 258 Mich App 175, 210; 670 NW2d 675 (2003). "A party is not allowed to assign as error on appeal something which his or her own counsel deemed proper at trial since to do so would permit the party to harbor error as an appellate parachute." *Dresselhouse v Chrysler Corp*, 177 Mich App 470, 477; 442 NW2d 705 (1989).

In this case, plaintiff did not object when defendant first used the breakfast schedule as, essentially, a demonstrative exhibit during its examination of Cope.[9] Therefore, this issue arguably may be considered waived because plaintiff did not object to the schedule until closing argument. See MRE 103(a)(1). Regardless, relief is not warranted for the simple reason that plaintiff actually used the schedule during her examination of Cope. In particular, plaintiff's counsel used the schedule to try to elicit testimony from Cope that the dining room ordinarily opened at 7:00 a.m., and that it may have opened earlier on the morning in question because it was Easter Sunday. Thus, because plaintiff used the schedule during her re-cross examination of Cope, she cannot obtain relief on appeal for defendant's subsequent use of the schedule during its closing argument. In other words, because plaintiff contributed to the use of the schedule during trial, she cannot

---

[9] The breakfast schedule cannot actually be considered a "demonstrative exhibit" because it was not admitted by the trial court.

obtain relief on appeal for any error that may have occurred in that regard. See *Lewis*, 258 Mich App at 210.

## IV. EXPERT TESTIMONY

Plaintiff argues that the entire deposition testimony of Dr. Marsh-Senic should have been ruled inadmissible because she assumed facts, so her testimony lacked foundation. We disagree.

"A trial court's decision to admit evidence is within its sound discretion and will not be disturbed absent an abuse of discretion." *Chmielewski v Xermac, Inc*, 457 Mich 593, 613-614; 580 NW2d 817 (1998).

MRE 702 provides as follows:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"Under MRE 702, it is generally not sufficient to simply point to an expert's experience and background to argue that the expert's opinion is reliable and, therefore, admissible." *Edry v Adelman*, 486 Mich 634, 642; 786 NW2d 567 (2010). "Experts can't speculate. They need analytically sound bases for their opinions." *Id*. at n 6 (cleaned up). "It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate." *Id*. (cleaned up). "This is not to say, however, that the subject of the medical testimony must be known to a certainty." *Spect Imaging, Inc v Allstate Ins Co*, 246 Mich App 568, 578; 633 NW2d 461 (2001) (cleaned up).

However, "[t]his Court has held that an expert's opinion is objectionable where it is based on assumptions that are not in accord with the established facts." *Badalamenti v William Beaumont Hosp-Troy*, 237 Mich App 278, 286; 602 NW2d 854 (1999). "This is true where an expert witness' testimony is inconsistent with the testimony of a witness who personally observed an event in question, and the expert is unable to reconcile his inconsistent testimony other than by disparaging the witness' power of observation." *Id*.

In her brief on appeal, plaintiff identifies the following six transcript excerpts from Dr. Marsh-Senic's deposition to show that she assumed facts and otherwise impermissibly speculated:

> Q. Based on your understanding as to the allegations in this case, your review of the record, and your recollection of Mr. Gracey, do you have an opinion, to a degree of medical certainty, as to what you saw in Mr. Gracey's mouth in the emergency department?
>
> MR. JENKINS: Foundation objection as to allegations in this case and all of the other things that you prefaced the question on.

A.  So, I mean, more likely than not, I would assume that it was the tube feed, because looking at the case as a whole and looking at the other notes, it seems that since he was getting tube feeds for more than 12 hours overnight and that he vomited, that part of the vomit that would have come up would be tube feed.  So that's most likely what was in his mouth.

* * *

Q.  You did not write in your note, at the time that you saw this, that what you saw was the tube feeding contents, did you?

A.  Well, I assumed it was food since it was in his mouth.

Q.  You didn't write enteral feeding contents, did you?

A.  Well, no, I wouldn't write that, because the nurse and I assumed it was food since it was in his mouth.

* * *

Q.  What you wrote there, there is still food in his mouth, came from your own observation, isn't that true?

A.  The nurse and I looking in his mouth, yes.

* * *

Q.  Well, I'm asking you questions about what you wrote in the record, Doctor, with all due respect, and what you wrote in the record, there is still food in his mouth.

A.  Okay.  And whether it was tube feed, or actual regular food that would be in his stomach after he chewed it and swallowed it, I can't tell you.

Q.  Okay.  So as we sit here today, you can't determine what you observed in his mouth.  Is that a fair statement?

A.  I mean, whatever was in his mouth was what he had vomited.

Q.  Okay.  Well, but you made a determination that what he had vomited was food; true?

A.  Whether it's tube feed or regular food, I can't say.  There was something in his mouth, some sort of substance, and it looked somewhere between -- thicker than -- like more watery than paste that was yellowish.

* * *

-13-

Q. Do you have any -- or what is your opinion as to the indications in the medical record that eggs were found in Mr. Gracey's mouth and when that discovery occurred?

MR. JENKINS: I'm just going to object to foundation. . . .

Q. In your knowledge, training and experience as a physician, working in a hospital setting where, as you indicated, telephone records are created, what's your understanding as to how that got into Mr. Gracey's medical record, or your opinion?

MR. JENKINS: It's an objection to foundation . . . .

A. I would assume that the doctors who saw the patient after me, since they never actually saw the material in Mr. Gracey's mouth, either heard that information from the ER nurse, from other residents, or from the patient's wife, who was, again, given that information by the ER nurse.

MR. JENKINS: I'm just going to object and move to strike what she assumes. . . .

Q. But based on your review of the medical records, is it your opinion that the physicians that authored those notes found eggs in Mr. Gracey's mouth?

MR. JENKINS: I'm going to say that there's leading, form, foundation, asked and answered.

A. Well, so I'm the only physician -- myself and the nurse are the only people that actually saw what was in Mr. Gracey's mouth.

So, no, no other providers would have been describing that in their note based on, like, their own firsthand visualization.

Plaintiff raises two distinct challenges to Dr. Marsh-Senic's testimony quoted above, neither of which have merit.

First, plaintiff argues that Dr. Marsh-Senic's testimony should have been ruled inadmissible because "Dr. Marsh-Senic was unable to testify at the more likely/probably than not standard of an expert relative to what was in Donald Gracey's mouth." (Quotation marks omitted.)[10] Relatedly, plaintiff argues that Dr. Marsh-Senic simply assumed that Gracey vomited tube feed. However, this argument seems to place a higher standard on the precise language used by an expert than what the law reasonably requires. It is true that Dr. Marsh-Senic testified that

---

[10] Plaintiff cites *Skinner v Square D Co*, 445 Mich 153; 516 NW2d 475 (1994), for the proposition that an expert must testify to a "more likely than not" standard. While we are unsure that *Skinner* actually stands for that proposition, it is clear that an expert cannot speculate.

"[w]hether it's tube feed or regular food, I can't say," and that she occasionally used the word "assume," or some variant of that word, to describe her opinion. At first glance, this testimony does appear to suggest that she had no fact-based opinion on whether Gracey vomited solid food or tube feed. But, Dr. Marsh-Senic elsewhere testified in her deposition that "more likely than not, I would assume that it was the tube feed," and "most likely what was in his mouth" was tube feed. She added that her opinion in this regard was based on her personal treatment of Gracey, coupled with her review of the notes of this case. Thus, the most reasonable understanding of Dr. Marsh-Senic's testimony, when read as a whole, is that she opined that Gracey probably vomited tube feed but that she could not state with absolute certainty that he actually did so. The answers highlighted by plaintiff on appeal may have been helpful for undermining the credibility of Dr. Marsh-Senic's testimony in the trial court, but they do not provide a basis for conclusion that her entire testimony should have been excluded.

Second, plaintiff argues that Dr. Marsh-Senic's testimony should have been ruled inadmissible because "Dr. Marsh-Senic's testimony was inconsistent with at least two witness's personal observations of the contents of Donald Gracey's mouth: (1) her own personal observations and (2) the ER nurse's observations." This is meritless. With regard to the contention that Dr. Marsh-Senic's testimony was inconsistent with her original notes on the matter, she explained at the deposition that she used the word "food" to distinguish from "mucous or saliva or any other, you know, normal mouth secretions." Thus, when Dr. Marsh-Senic wrote the word "food" in her original notes, she was not necessarily referring to solid food but, instead, some type of nourishment as opposed to normal mouth secretions. It was entirely consistent for her to write the word "food" in her original notes and then later opine at the deposition that Gracey probably vomited tube feed.

With regard to the contention that Dr. Marsh-Senic's testimony was inconsistent with the observations of the ER nurse, who allegedly indicated to plaintiff that Gracey had eggs in his mouth, because the ER nurse never testified at trial, the basis for her statement is unclear. In contrast, Dr. Marsh-Senic testified on the basis of her personal observations that Gracey likely vomited on tube feed. Simply put, the hearsay statement of a non-testifying nurse—which itself was ruled inadmissible—cannot supersede the statements of the doctor who actually treated Gracey and was subjected to a deposition.

For these reasons, the trial court did not abuse its discretion by allowing Dr. Marsh-Senic's testimony to be presented to the jury.

## V. CONCLUSION

There were no errors warranting relief. Therefore, we affirm.

/s/ Mark J. Cavanagh
/s/ Michael J. Riordan
/s/ Sima G. Patel

-15-