*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MICHAEL BENIGNI, Personal Representative of the ESTATE OF PATRICIA BENIGNI,

        Plaintiff-Appellant,

v

SAMIR ALSAWAH, M.D., and HURON MEDICAL CENTER, PC,

        Defendants-Appellees.

UNPUBLISHED
April 15, 2025
10:27 AM

No. 369109
St. Clair Circuit Court
LC No. 19-001198-NH

Before: MALDONADO, P.J., and LETICA and WALLACE, JJ.

PER CURIAM.

In this traditional medical malpractice action, plaintiff, Michael Benigni, as the personal representative of the Estate of Patricia Benigni, appeals as of right the trial court order granting summary disposition in favor of defendants, Samir Alsawah, M.D., and Huron Medical Center, P.C. We affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

This case was the subject of a prior appeal. In *Benigni v Alsawah*, 343 Mich App 200, 203-204; 996 NW2d 821 (2022),[1] this Court set forth the following factual history:

> In 2012, Patricia was diagnosed with Stage III colorectal cancer. She was referred to HMC and Dr. Alsawah, a board-certified medical oncologist, in November 2012. Patricia received neoadjuvant chemotherapy and radiation treatment to prepare for surgery. Subsequently, a resection to remove the tumor was performed in February 2013. From March to September 2013, Patricia received nine rounds of adjuvant chemotherapy to lower the risk of recurrence and to address lymph node concerns. Throughout 2013, Dr. Alsawah checked and

---

[1] The *Benigni* decision was rendered by a majority and a dissent.

monitored Patricia's carcinoembryonic antigen (CEA) level approximately every four to six weeks, with the level ranging from 1.6 to 4.4 nanograms per milliliter of blood (ng/mL) in nine separate tests. An abdominal and pelvic computerized tomography (CT) scan did not reveal recurrence or spread of the cancer.

Monitoring CEA levels in patients is a critical indicator for discovering cancer recurrence. In his deposition, Dr. Jeffrey Gordon, a board-certified medical oncologist and hematologist, testified that based on his experience and review of peer-reviewed medical literature, a CEA level above 15 ng/mL rarely reflected a false indicator of colorectal cancer. And, according to Dr. Gordon, if the CEA level was over 35 ng/mL, "it was always associated with a recurrence of colorectal cancer."

In March 2014, Patricia's CEA level was checked again, and it measured 4.5 ng/mL. This was the only CEA test performed in 2014. Patricia's CEA level was 8.3 ng/mL in January 2015 and rose to 24.2 ng/mL in April 2015. By November 2015, her CEA level had once again risen, testing at 38.6 ng/mL. Despite Patricia's elevated CEA level, a CT scan performed in 2015 did not reveal a recurrence or spread of the cancer. Dr. Alsawah did not order any other diagnostic procedures or further explore the cause of the elevated CEA level.

For the next two years, Patricia's CEA levels continued to rise precipitously. Patricia had a CEA level of 59.3 ng/mL in May 2016. A CT scan and colonoscopy were performed but did not reveal a recurrence or metastasis of the cancer. When Patricia saw Dr. Alsawah on August 23, 2016, he again tested her CEA level, which measured 78.5 ng/mL. She also complained of fatigue. Again, Dr. Alsawah did not further explore the cause of the elevated CEA level. He also began scheduling Patricia for visits every six months.

In February 2017, Patricia's CEA level was 175.9 ng/mL. In August 2017, her CEA level measured 459 ng/mL, and Patricia complained of weakness and fatigue. A CT scan performed in August 2017 revealed a large liver mass suspicious of metastasis[2] with possible involvement of the adrenal glands. There was no apparent indication of tumor recurrence at the original surgical site. A positron emission tomography (PET) scan also showed a large hepatic mass and additionally gave rise to cancer concerns regarding the right adrenal gland. Patricia had a liver biopsy on October 9, 2017, which confirmed a metastatic adenocarcinoma.

---

[2] "Metastasis is when cancer spreads beyond the place where it started to other areas of your body. Nearly all cancers have the potential to metastasize." <https://my.clevelandclinic.org/health/diseases/22213-metastasis-metastatic-cancer> (accessed April 14, 2025).

On October 23, 2017, Patricia conferred with a surgeon regarding possible treatment of the metastasized cancer but was advised that surgery was no longer a viable option. Patricia died in February 2018.

The *Benigni* majority then summarized the complaint and set forth the allegations of malpractice raised by plaintiff, the Estate:

On May 24, 2019, the Estate filed a medical malpractice complaint against HMC and Dr. Alsawah. Count I alleged negligence by Dr. Alsawah. The Estate maintained that Dr. Alsawah breached the standard of care by failing to "[e]valuate and/or investigate the cause of [Patricia's] increasing CEA levels[,]" by failing to "[w]ork up the patient to rule out the presence of metastatic disease[,]" and by committing "[o]ther acts and/or omissions to be determined throughout the course of discovery." The Estate also alleged:

34. As a direct and proximate result of the aforementioned violations of the standard of care by Dr. Alsawah, there was a delay in the diagnosis of Patricia Benigni's metastatic disease.

35. As a result of the delay in diagnosis, there was an advancement in the disease process resulting in the formation of metastatic lesions in the liver and adrenal glands.

36. That an earlier diagnosis of the disease would have given Patricia Benigni a better prognosis, including increased survival or cure.

In Count II of the complaint, the Estate alleged vicarious liability with respect to HMC.

The Estate attached to the complaint an affidavit of merit by Dr. Gordon. He averred that "[a]n earlier diagnosis of the disease would have given Patricia Benigni a better prognosis, including survival." [*Id.* at 205-206.]

In February 2021, defendants moved for summary disposition under MCR 2.116(C)(10), relying on the loss-of-opportunity doctrine. Defendants contended that there was no scientifically reliable information to establish that Patricia's opportunity to survive "was ever greater than 50% or that her opportunity to survive was diminished by 50%." To support this claim, defendants claimed that cancer treatment community literature established that Patricia's opportunity to survive "was not reduced by greater than 50% as a result of the alleged delay in diagnosing the metastasis." *Id.* at 208.

The Estate countered that defendants ignored the spirit of the lost-opportunity doctrine which allowed for recovery of the loss of an opportunity to survive, not merely the initial opportunity to survive. The Estate alleged that a proper evaluation and treatment of Patricia's CEA levels would have resulted in an earlier diagnosis, "curative treatment options" and increased her opportunity to survive or to achieve a better result. The trial court issued a written opinion granting the defendants' motion. It noted that the parties agreed that the controlling analysis was

-3-

found in *Fulton v William Beaumont Hosp*, 253 Mich App 70, 84; 655 NW2d 569 (2002), and accepted that it was a lost-opportunity case. The trial court ultimately granted summary disposition to defendants, concluding that there was no evidence "that Patricia's opportunity to survive was reduced by 50% as a result of Dr. Alsawah's alleged malpractice[.]" *Benigni*, 343 Mich App at 209.

The *Benigni* majority determined that "[c]ontary to the statement of the case by both parties and the trial court, the facts of this case present a claim of traditional medical malpractice, not one of loss of opportunity to survive or achieve a better result." *Id*. at 209. After examining MCL 600.2912a(2) (addressing the burden in a medical malpractice action), the *Fulton* decision, and *O'Neal v St John Hosp & Med Ctr*, 487 Mich 485, 495; 791 NW2d 853 (2010), our Court concluded that it was bound by a majority holding in *O'Neal* that *Fulton* was mischaracterized as a lost-opportunity case. And, after examining the gravamen of plaintiff's complaint, the *Benigni* majority determined that the claim raised was one of traditional malpractice, not lost opportunity. *Benigni*, 343 Mich App at 212-213. Following the determination that the gravamen of the complaint actually raised a claim of traditional medical malpractice, the *Benigni* majority declined to address the issue of causation because the trial court had not ruled on the issue. ("Because the parties and the trial court incorrectly framed this case as one involving lost opportunity, there has been no briefing or analysis regarding traditional malpractice causation. We conclude that the issue should first be addressed by the trial court.") *Id*. at 213-214. The *Benigni* case was decided on September 8, 2022, and no party sought leave to appeal.

On October 31, 2023, defendants moved for summary disposition, contending that plaintiff could not establish causation. Specifically, defendants asserted that plaintiff could not present substantial evidence from which a jury could conclude that it was more likely than not, but for defendants' alleged negligence, Patricia's injuries would not have occurred. That is, plaintiff could not establish that defendants caused the metastasis of Patricia's cancer or that the alleged delay in diagnosis of the metastasis proximately caused her death. Defendants argued plaintiff failed to present scientifically reliable expert testimony or literature to show it was more likely than not that, had the metastasis of Patricia's cancer been diagnosed in 2015 or in 2017 when it was finally detected on a CT scan, that it would have changed her outcome. In its initial summary disposition decision, the trial court commented that there was "so much speculation involved in this case," and defendants argued that continued to be true. Defendants asserted no question of fact existed for the jury to conclude that "but for" defendants' alleged negligence, Patricia's injuries would not have occurred. This inability to establish actual or legal causation was fatal to plaintiff's case. Defendants claimed that whether the trial court analyzed plaintiff's claim as lost opportunity or lack of proximate cause was "a distinction without a difference as applied to the underlying facts." For the same reason that plaintiff could not show Patricia's opportunity to survive was reduced by 50%, plaintiff could not demonstrate that "any act or omission by Defendants caused the metastasis of [Patricia's] cancer or that the alleged delay in diagnosing the metastasis proximately caused her death."

On November 30, 2023, plaintiff filed its response to defendants' dispositive motion premised on causation. Plaintiff alleged that it was only required to prove by a preponderance of the evidence that defendants' failure to diagnose the metastasis earlier injured Patricia. And, plaintiff's medical literature indicated that "surgical resection is the treatment of choice when feasible and offers the greatest likelihood of cure for patients with liver-isolated colorectal cancer."

For surgical cases, five-year survival rates after resection ranged from 24% to 58% or an average of 40%. Moreover, plaintiff was not necessarily required to provide a percentage approximation for proximate cause. Rather, defendants' conduct was to be evaluated in light of the facts, circumstances, and expert opinion. Patricia died from metastasized colorectal cancer because it was undiagnosed and progressed to the point that there was no curative surgical option available. "Defendants failure to timely diagnose the recurrence of cancer removed the potential of surgical resection which lessened [Patricia's] five-year statistical survival rate from 24 to 58 percent to 14 to 16 percent." When viewed in the light most favorable to plaintiff, Patricia more probably than not suffered an injury that was proximately caused by defendants' negligence. Therefore, plaintiff requested that defendants' causation motion be denied.

The trial court heard oral argument on the causation dispositive motion. After the parties reiterated the arguments raised in their briefs, the trial court stated:

> This is certainly an interesting case. It's got a lot of twists that the Court doesn't typically deal with in medical malpractice cases obviously because of the remand from the Court of Appeals on an entirely different causation theory. And we do have our marching orders, and we have to discharge our duty as it relates to that. But I tend to agree with [defense counsel] in principle, that even though the Court of Appeals has told us to look at this as a traditional medical malpractice case on the issue of causation, the facts of this case and the circumstances of this case keep bringing us back to more of a statistical and mathematical analysis. And I appreciate the fact that Plaintiff and Dr. Gordon are trying to maybe wiggle their way into a situation that might change things.

> I also recognize that some of the things that Dr. Gordon are [sic] saying is just inconsistent with what he had said before, and that raises problems what we're all familiar with . . . in offering different factual testimony that would be contrary to a prior affidavit or testimony in order to survive a Motion for Summary Disposition. I won't say anything more about that, but the one thing I noted in Dr. Gordon's testimony or statements, whether it's in affidavit form or otherwise, that he seems to want to get away from the fact that there was a very distinct possibility that the cancer had spread beyond the liver. He said the liver is the number one suspect, but he still couldn't say in 2015 that that's where things were starting to settle. But he also was concerned about it moving into other areas. And we now know two years later that it did, in fact, do all of those things.

> And when he wants to talk about that, whatever the low number is to the 58 percent number that testimony is, in my view, is limited to a cancer that is contained to the liver and identifiable and detectable. And then it becomes a question as to whether or not surgery is warranted. And all of the other factors that enter into that in terms of the patient being a good candidate and so forth. I'm still at the point in this case where I believe that in order to get to where the Plaintiff needs to get there is a series of speculative arguments or theories that have to be advanced in order to get there. And any one of those can be fatal to meeting the elements of the cause of action. And that was the case before and I think that that is the case again.

The Court here has an important gatekeeping function. This is a complicated issue. And I'm not going to say that jurors can't figure their way through it. I think they deal with standard of care better than they do perhaps causation. This is a trickier thing to understand. And we all know people that have been diagnosed with cancer and have had, you know, bad outcomes as a result of that. And it's kind of personal and it might be very personal to certain jurors. I think we need to be careful as to what the jury gets exposed to and what they don't. And that's where the Court's gatekeeping function comes in.

I tend to agree, and even if we get to the very end, which is surgery, there's absolutely no reason to believe that [Patricia], in this particular case, would have had a different result. The outcome - - there's just, there's nothing to suggest that, there's no competent evidence to suggest that it would have been any different, even if all of those procedures and all of those attempts had been made to save her. There's just nothing to suggest that she would have had a different outcome. She falls in that 85 percent category where she is likely to die as a result of her illness. And that's exactly what happened here.

I do find the Defendant's [sic] position to be the correct one, and I support it wholeheartedly. Motion is granted.

From this decision, plaintiff appeals.

## II. STANDARD OF REVIEW

A trial court's decision on a motion for summary disposition is reviewed de novo. *White v Henry Ford Macomb Hosp Corp*, 346 Mich App 405, 419; 12 NW3d 635 (2023). A motion for summary disposition premised on MCR 2.116(C)(10) tests the factual sufficiency of the complaint. *Id*. The moving party must identify and support the issues to which the moving party believes there is no genuine issue of material fact, and the affidavits, pleadings, depositions, admissions, and other documentary evidence submitted with the motion must be examined. *Charter Twp of Pittsfield v Washtenaw Co Treasurer*, 338 Mich App 440, 449; 980 NW2d 119 (2021). Once the moving party makes and supports its motion, the opposing party may not rest on mere allegations or denials in the pleadings, but must submit documentary evidence setting forth specific facts to demonstrate a genuine issue for trial. *Id*.

When responding to a motion for summary disposition, a party with the burden of proving causation must "set forth specific facts that would support a reasonable inference of a logical sequence of cause and effect." *Skinner v Square D Co*, 445 Mich 153, 174; 516 NW2d 475 (1994). Causation may be shown circumstantially, but the adequacy of circumstantial proof "must facilitate reasonable inferences of causation, not mere speculation." *Id*. at 164. Causation evidence must "exclude other reasonable hypotheses with a fair amount of certainty." *Craig v Oakwood Hosp*, 471 Mich 67, 87-88; 684 NW2d 296 (2004) (quotation marks and citation omitted). "Our case law requires more than a mere possibility or a plausible explanation." *Id*. at 87. That is, "litigants do not have any right to submit an evidentiary record to the jury that would allow the jury to do nothing more than guess." *Skinner*, 445 Mich at 174.

-6-

III. ANALYSIS

Plaintiff alleges that the trial court erred in granting defendants' motion for summary disposition because it presented sufficient competent evidence to create a genuine issue of material fact addressing proximate causation under traditional medical malpractice principles. We disagree.

Four elements must be established for a plaintiff to prove a medical malpractice claim:

(1) the applicable standard of care, (2) breach of that standard of care by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury. [*Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016) (quotation marks and citation omitted).]

"Expert testimony is required to establish the standard of care and to demonstrate the defendant's alleged failure to conform to that standard." *Decker v Rochowiak*, 287 Mich App 666, 685; 791 NW2d 507 (2010). A qualified expert witness may testify in the form of an opinion if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. [MRE 702.]

An expert's testimony is insufficient if it merely establishes a connection between conduct and an injury for purposes of establishing causation in a medical malpractice action. *Teal v Prasad*, 283 Mich App 384, 392; 772 NW2d 57 (2009). "[A] plaintiff cannot establish causation if the connection made between the defendant's negligent conduct is speculative or merely possible." *Id*. And, "an expert's opinion is objectionable where it is based on assumptions that are not in accord with the established facts." *Badalamenti v William Beaumont Hosp-Troy*, 237 Mich App 278, 286; 602 NW2d 854 (1999).

Proximate cause requires proof of both cause-in-fact and legal cause. *Craig*, 471 Mich at 86. In *Weymers v Khera*, 454 Mich 639, 647-648; 563 NW2d 647 (1997), our Supreme Court explained:

Under Michigan medical malpractice law, as part of its prima facie case, a plaintiff must prove that the defendant's negligence proximately caused the plaintiff's injuries. To establish proximate cause, the plaintiff must prove the existence of both cause in fact and legal cause. To establish cause in fact,

the plaintiff must present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred.

\* \* \*

-7-

"The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.

To establish legal cause, the plaintiff must show that it was foreseeable that the defendant's conduct "may create a risk of harm to the victim, and . . . [that] the result of that conduct and intervening causes were foreseeable." [Citations omitted.]

## IV. THE DOCUMENTARY EVIDENCE

A review of Patricia's medical records reveals that she had a history of substantial medical conditions even before her cancer diagnosis. Patricia's medical history included stroke, diabetes, hypertension, hyperlipidemia, and seizure disorder. With regard to surgeries, Patricia had a hysterectomy and a brain tumor resection. Patricia had a family history of diabetes and colon cancer. Additionally, she had neurological issues, including memory loss following her brain surgery, convulsions, tremors, confusion, headache, dizziness, tingling, and numbness. In November 2012, Patricia was referred to Dr. Alsawah for neo-adjuvant radiation/chemotherapy because a colonoscopy revealed a mass. Dr. Alsawah recorded that he discussed Patricia's care and prognosis with her and her husband. It was recommended that she undergo the radiation/chemotherapy followed by the curative surgical resection. She would also require chemotherapy after the surgery, but the decision was deferred until later. Patricia's surgical resection with diverting loop ileostomy occurred in February 2013 with Dr. Omar Kadro. In 2015 and 2016, Patricia's neurological conditions caused injuries arising from falls. Between 2013 and 2017, Dr. Alsawah continued to surveil Patricia through tests, scans, and physical examinations. Although Patricia's CEA levels began to dramatically increase, Dr. Alsawah did not order any other types of scans or recommend exploratory surgery.[3]

In October 23, 2017, Patricia consulted with Dr. Raofi, a general surgeon. Dr. Raofi's notes delineated Patricia's extensive medical history:

[Patricia] is a 68 year old lady who has been referred to us for evaluation of colon cancer metastatic to the liver. She was initially diagnosed with colon cancer over 4-1/2 years ago and underwent resection. Patient finished adjuvant therapy. Overall she has had difficulty with balance, neuropathy, frequent falls, and overall deconditioning. She also does have a history of meningioma dating over 12 years ago with resultant seizures after surgery.

---

[3] Dr. Alsawah's treatment or his rationale is not discussed further because any breach of the standard of care is not challenged in this appeal.

-8-

According to the patient she has not had a seizure in over 2 years. However she is still experiencing recurrent falls almost on a weekly basis. Over the past few months patient has been experiencing increasing and worsening right upper quadrant pain, worsening appetite and weight loss. She mentioned nausea no emesis. She denies any fever or chills. She denies any change in stool habits or blood in the rectum.

Main issue with patient is again in general overall functional status and physical deconditioning. She carries out activities of daily living with difficulty and can barely ambulate 1-2 blocks at a very slow pace.

With regards to her colorectal cancer, despite elevated CEA levels, the patient had negative imagings until recently. However recent imaging shows a large mass in the right lob and left medial section of the liver. There is also enlargement of both adrenal glands concerning for metastatic disease, with the right being worse than the left.

* * *

Recent MRI reviewed which shows a very large mass in the right lobe of the liver and extending into the left medial segment. The only spared portion of the liver seems to be the left lateral segment. There is also significant enlargement of the right adrenal gland suspicious for metastatic disease. There is also enlargement of the left adrenal gland though not as significant as the right side.

Assessment and Plan:

[Patricia] is a 68-year-old lady who has biopsy-proven metastatic lesion to the liver. Unfortunately the location of the lesion would require major resection in the form of a trisegmentectomy. While this is technically feasible, our concern is the patient's overall performance status which can significantly affect her recovery from major hepatic surgery. Furthermore there is concern for metastatic disease to the adrenal gland. Even though the adrenal gland can also be surgically removed, once there is presence of hematogenous spread in two different visceral organs, the overall prognosis is inferior than that for metastatic liver disease only.

These findings were discussed with the patient and husband in detail. We did also review the films with Dr. Lal from radiology in the right adrenal gland is amenable to percutaneous biopsy. Therefore prior to making any final surgical recommendations, we will schedule the patient for biopsy of the right adrenal gland and contact her once the results are available.

Ultimately, Patricia did not have the surgery, and she died four months later.

In addition to the medical records, defendants submitted an affidavit of meritorious defense from Dr. Philip A. Philip, an oncologist. After reviewing Patricia's medical records, the survival statistics for Patricia's metastatic colorectal cancer, and the data maintained by the National Cancer Institute (NCI), the Surveillance, Epidemiology, and End Results Program (SEER), as well as the

American Joint Commission on Cancer (AJCC), he averred that the 2015 survival rate for her cancer was less than 20%. Dr. Philip concluded that Patricia's opportunity to survive metastatic colorectal cancer was never greater than 50% and it was not diminished by greater than 50% as a result of the alleged failure to detect the metastasis earlier.

As noted, a medical malpractice action requires proximate causation, which includes both cause-in-fact and legal cause. *Craig*, 471 Mich at 86. To establish cause-in-fact, the plaintiff must present "substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Weymers*, 454 Mich at 647. Defendants made and supported their burden to demonstrate that cause-in-fact was lacking. Specifically, Dr. Alsawah was monitoring Patricia for cancer recurrence. Although the rising CEA levels were indicative of a recurrence, plaintiff does not allege that Dr. Alsawah's treatment *caused* the recurrence. And, even if it is asserted that Dr. Alsawah's inaction with regard to ordering additional scans or recommending surgery led to Patricia's death, Patricia's survival rate once the cancer recurred as Stage IV metastatic, according to Dr. Philip, was below 20%. And, the statistics relied on by Dr. Philip did not include factors of poor performance in light of Patricia's extensive preexisting medical conditions.

To contest defendants' entitlement to summary disposition, plaintiff submitted its own documentary evidence. Plaintiff's expert, Dr. Gordon, submitted an affidavit of merit in which he opined that there was a delay in the evaluation of Patricia's rising CEA levels and an earlier diagnosis of the metastasis of her disease would have given her a "better prognosis, including survival." In his deposition, Dr. Gordon testified he reviewed articles reflecting that a rising CEA level was associated with a higher likelihood that colorectal cancer had recurred. And, Dr. Gordon faulted defendants for failing to perform a PET scan in addition to the CT scan to find the recurrence. Although Dr. Gordon acknowledged that CT and PET scans may be combined to yield a better result, it was possible that both scans would not disclose the presence of cancer. Dr. Gordon did not conclude, however, that the standard of care required further action at that time. He opined that the standard of care "may" result in the consideration of performing a biopsy in the area of the cancer removal when dealing with rising CEA levels and negative PET and CT scans. Moreover, the standard of care did not require cancer therapy such as chemotherapy merely because of a rise in CEA levels. Dr. Gordon acknowledged that disease may not appear on a CT scan because it falls below the "detection threshold" and that disease from the primary tumor will travel though the blood supply to a distant site.

But, Dr. Alsawah's alleged breach of the standard of care in light of the rising CEA levels is not the issue. Rather, the parties address the issue as Patricia's viability or injury following a failure to diagnose the Stage IV recurrence of cancer in November 2015 (when Dr. Gordon states it should have been diagnosed because of the rising CEA levels) versus its actual diagnosis in 2017. Dr. Gordon acknowledged databases gave survival statistics for people with rectal cancer which included the NCI, SEER, and AJCC. Dr. Gordon opined that, if a patient was diagnosed with Stage IV rectal cancer in 2012, "[n]early all patients, unfortunately, at that point in time would have been dead by around the two, two and a half year mark." Addressing a recurrence of cancer in 2017 in the liver and adrenal gland and survival rates, Dr. Gordon did not expressly address survival statistics, but noted a patient's survival was contingent on how much the liver was involved and whether surgery was an option. When pressed, he acknowledged that less than half of patients diagnosed with Stage IV rectal cancer in 2017 would be alive five years later.

-10-

Although he eventually gave statistics regarding general survival rates, Dr. Gordon acknowledged that the rates varied "depending upon your situation." Yet, Dr. Gordon did not evaluate whether Patricia could be included in the general statistical rate or if she fell below it in light of her medical history that included a stroke, brain tumor, and seizures. When asked to identify when cancer cells traveled to Patricia's liver, Dr. Gordon opined that it was "likely . . . around that time that that CEA of 38 was obtained" or in November 2015.

When asked to provide statistical survival rates in 2015 for a patient with recurrent rectal cancer that spread to the liver, Dr. Gordon acknowledged that it depended "upon the situation." He claimed that a patient could potentially be cured if it could be surgically removed or that survival would last beyond five years. Dr. Gordon then opined that half the patients would still be alive 2 ½ to 3 years as a "middle of road number" that had to be taken with a "big grain of salt" because of additional treatments. He further acknowledged that the survival rate was contingent on whether the cancer metastasized to the liver. Dr. Gordon was unaware of AJCC and SEER data in this instance. When asked to address Patricia's specific situation if the cancer had been discovered in 2015, he acknowledged that it was possible that Patricia would have died even if curative-intent surgery was attempted.

In addition to his deposition, Dr. Gordon also filed an affidavit that stated, in pertinent part:

7. It is my opinion that proper investigation of the cause of the rising CEA levels would have evidenced the metastatic disease as early as November of 2015. It is further my opinion that if the liver metastasis was diagnosed in November 2015, rather than in 2017, it is more likely [Patricia] would have had an option for curative-intent surgery, as well as additional treatment modalities. These modalities would have provided an opportunity to achieve a better result, including survival. My opinion that these modalities, including curative-intent surgery, would have provided such an opportunity is based on published medical literature.

But, mere conclusory allegations in an affidavit that are devoid of detail are insufficient to create a genuine issue of material fact. *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). Although Dr. Gordon concluded that plaintiff would have had the option of curative-intent surgery in 2015 and additional modalities, he failed to identify what those modalities were. And, plaintiff was required to present substantial evidence to allow the jury to conclude that it was more likely than not that, but for Dr. Alsawah's conduct, Patricia's injuries would not have occurred. Dr. Gordon did not state that Dr. Alsawah's inactions were the cause-in-fact of Patricia's recurrence of cancer. And, he did not state that Dr. Alsawah's inactions in 2015 were the cause of Patricia's death in 2017. In his deposition, Dr. Gordon failed to opine that any injury was more likely than not caused by the breach in the standard of care. At one point in his deposition, Dr. Gordon testified that the cancer was not likely in the adrenal glands in 2015, implying that a 2015 diagnosis would have resulted in treatment that prevented the spread of cancer to the adrenal glands. Upon further questioning of his opinions, Dr. Gordon never quantified what he meant when he said the cancer was not "likely" present in the adrenal gland in 2015. So, there was no testimony that the cancer was more likely than not present in the adrenal gland in 2015, nor was

-11-

there any testimony that, more likely than not, cancer would not have spread to the adrenal gland if defendants had complied with the standard of care.[4]

Nonetheless, plaintiff asserts that the trial court erred in granting defendants' motion for summary disposition in light of the treatment Patricia received. That is, Dr. Alsawah was conducting surveillance on Patricia to check for a recurrence of cancer. Then, Patricia was referred to surgeon Dr. Raofi for treatment, and he opined that the surgery itself was feasible even though Patricia's performance thereafter was questionable in light of her medical conditions.

Plaintiff's burden is to present "substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred. *Weymers*, 454 Mich at 647. This evidence is insufficient if it demonstrates only the mere possibility of causation. *Id*. at 647-648. If the issue continues to be premised on pure speculation or conjecture, an evidentiary record that allows the jury to guess is not properly submitted. *Id*.; *Skinner*, 445 Mich at 174.

We conclude that plaintiff failed to present substantial evidence from which a jury could conclude that Dr. Alsawah's conduct, in failing to diagnose the metastatic cancer in 2015, more likely than not caused Patricia's death. Patricia was treated for colorectal cancer in 2012. Although her CEA levels were monitored in conjunction with other tests and began to rise substantially, the metastasis of the cancer was not confirmed until 2017. At that time, although surgery was deemed feasible, it was not recommended because of Patricia's other health issues.

After the case was returned to the trial court for an evaluation of causation in a traditional medical malpractice action and not a loss-of-opportunity matter, the parties did not seek to retain new experts or re-depose experts to focus on this traditional theory of malpractice. Instead, defendants continued to rely on the NCI, SEER, and AJCC data that Patricia's survival rate from metastatic colorectal cancer was less than 20%. Dr. Gordon, in his testimony and affidavit, seemingly attempted to avoid that statistic. And, he opined that the cancer had metastasized to the liver in 2015 in light of the CEA level and claimed that the cancer had not yet progressed to the adrenal glands. But, Dr. Gordon did not have tests or other data to substantiate that opinion regarding progression. His opinion was merely conjecture and speculation. Under the circumstances, the trial court properly granted defendants' motion for summary disposition.

Affirmed.

/s/ Allie Greenleaf Maldonado
/s/ Anica Letica
/s/ Randy J. Wallace

---

[4] Again, defendants' dispositive motion challenged causation. Our mention of the standard of care relates to the issue of causation.